OPINION OF THE COURT
Chief Judge Breitel.
Petitioner Nehra, the mother, seeks custody of her two children, now aged 11 and 9. Respondent Uhlar, the father, opposes the petition, relying in part on a prior Michigan judgment granting him a divorce and awarding him custody of the children. Family Court granted the petition, but a divided Appellate Division reversed and awarded custody to the father. The mother appeals.
There is litigation over the custody of the hapless children because their mother on a visit in Michigan abducted the children and succeeded in hiding them with her for more than nine months in New York State. She and the children and her new husband now live in New Jersey. The father still resides in Michigan. A separate litigation was brought in New Jersey while the New York proceeding was pending. The New Jersey court has deferred to the courts of this State.
*246 It is undisputed that the best interest of the children must govern in the adjudication of custody. Certainly on no view may their interests be ignored. The issue that remains is whether those interests require that the children be left with their mother, who has apparently provided them with a good enough home for over four and a half years, despite the Michigan judgment giving custody to the father, and even though the mother obtained possession of the children by abduction and for more than nine months prevented the father from finding or seeing the children.
The order of the Appellate Division should be affirmed.
Although returning the children to their father will provide yet another disruption in the young lives of these unfortunate children, the evidence indicates, and the trial court found, that he can also provide, as he had before, a good enough home for them. And, in the long run, refusal to condone abduction of children will provide better stability for the Uhlar children, who would otherwise remain subject to the exercise of lawless self-help by either of their embattled parents.
The parties, then both residents of Michigan, were married in 1964. They both hold advanced graduate university degrees. They had two children, Sandrae, born in 1966, and Marke, born in 1968, before their separation in 1970. The mother brought a divorce action in Michigan in January, 1970, and retained custody of the children in the marital home while the divorce action was pending. On March 3, 1972, after trial in the action for divorce, the father was awarded custody, because of the mother’s misconduct and unfitness in the care of the children. The mother was granted visitation rights. The father was given possession of the marital home. Nine months later, on December 26, 1972, the father remarried. The new Mrs. Uhlar, and her young daughter by her former marriage, moved into the Uhlar home. On February 12, 1973, in Connecticut, the mother, too, was remarried, to Gerald Nehra, whose former marriage had also ended in divorce.
In the application for the marriage license the mother gave her occupation as that of attorney and stated that she had never been married. Five days after her remarriage, during a Michigan visitation period, the mother absconded with the children and returned to her new home in New York. Efforts were made to conceal the whereabouts of the children, including listing the Nehra telephone number under an alias. De *247 spite an extensive search, not until December 5, 1973, more than nine months later, did the father locate his children. Even then, he was denied the opportunity to see them, and, on one occasion, even the chance to talk with them on the telephone at Christmas time.
For a year after the father discovered his children, he was not permitted by the mother to have them visit him in Michigan. And even when the father came to visit the children in New York, which he did eight times in the first year after their discovery, he was only permitted to see them in the presence of their mother or her second husband. The children’s paternal grandfather, the father’s second wife, and his stepdaughter, were denied access to the children altogether. When the father was finally permitted, in December, 1974, to take the children to Michigan for a visit, he was required under New York court order to post $2,500 bond. Each subsequent visit with the father in Michigan has also required posting of a bond.
The mother brought this proceeding in Family Court to obtain legal custody on December 13, 1973, just eight days after the father discovered the children (Family Ct Act, § 651). On February 26, 1975, after a hearing, the mother was granted custody. On April 14, 1977, the Appellate Division reversed and awarded custody to the father.
The litigation has dragged on for over four years. The New York courts like so many "disinterested” Solomons must disentangle the web wrought by the mother, previously characterized by the Michigan court as selfish. Paradoxically, the mother who had defied the Michigan court brought both the divorce action in Michigan and the custody proceeding in New York.
While these proceedings were pending the Nehras moved to New Jersey, taking the Uhlar children with them. The removal was caused by the transfer in position of Mr. Nehra from New York State to New Jersey. A proceeding to validate the mother’s custody of the Uhlar children was started in New Jersey, but, as the briefs advise, the New Jersey court suspended proceedings and stated that it deferred to what the New York courts might hold in the present prior proceeding (compare Domestic Relations Law, § 75-g, eff Sept. 1, 1978). Consequently, there follows the paradox of Michigan children, now in New Jersey, having their care and custody determined in New York State where now neither of their parents nor *248 they are situated, and where the outstanding custody judgment is that of Michigan where they have not resided for almost five years.
The New York courts having proper jurisdiction by the presence of the children in the State when the custody proceeding was begun, its jurisdiction continues (see Removal of Child From State as Defeating Jurisdiction to Award Custody, Ann., 171 ALR 1405, 1406-1407; Jurisdiction of Court to Award Custody of Child Domiciled in State But Physically Outside It, Ann., 9 ALR2d 434, 446-447; Domestic Relations Law, § 75-d, subd 1, par [a], eff Sept. 1, 1978). No useful purpose on behalf of the children would be served by abstaining from exercise of jurisdiction and thereby projecting another round of protracted and protracting litigation.
It appears from the record that either parent would provide the children with a materially comfortable and loving home. Currently, in the mother’s custody, the children seem to be well adapted and are doing well in school. They get along with their stepfather, Mr. Nehra, whose own children by his prior marriage live with their mother in Michigan. Testimony of a psychologist retained by the mother indicated that there was no reason to disrupt the children, and that a change would be "potentially” damaging.
At the same time, testimony of neighbors of the Uhlars in Michigan indicates that the children appeared quite happy before they were abducted. Although the mother contends the children were ill-clothed and poorly cared for while in their father’s custody, those allegations are controverted by testimony from the neighbors. In fact, their testimony indicates that the children may not have been properly treated while the mother had custody pending conclusion of the Michigan divorce proceedings. Moreover, the father and his second wife appear to be providing a good home for the new Mrs. Uhlar’s daughter, and for two children born since the father’s remarriage.
 Paramount in child custody cases, of course, is the ultimate best interest of the child (Domestic Relations Law, § 70). That a change in custody may prove temporarily disruptive to the children is not determinative, for all changes in custody are disruptive. Given Mrs. Nehra’s hostility to her ex-husband, and her reluctance to allow even visitation with the father, it would be surprising indeed if the children were eager after their enforced separation from him to return to *249 their father. The desires of young children, capable of distortive manipulation by a bitter, or perhaps even well-meaning, parent, do not always reflect the long-term best interest of the children (see Dintruff v McGreevy, 34 NY2d 887, 888; Matter of Lincoln v Lincoln, 24 NY2d 270, 273).
As the court noted in the Dintruff case, "[t]here are periodic reorientations toward one or another parent, and this is especially true when young parents are involved and one or both remarries” (supra, p 888). In the Lincoln case, the court observed that "[a] child whose home is or has been torn apart is subjected to emotional stresses that may produce completely distorted images of its parents and its situation. Also its feelings may be transient indeed, and the reasons for its preferences may indicate that no weight should be given to the child’s choice” (supra, p 273).
The Michigan court awarded custody to the father based on findings that the mother’s conduct with several men in the house during the separation was dangerous to the welfare of the children. That judgment, like other custody decrees, is not entitled to full faith and credit in the courts of this State (see Matter of Berlin v Berlin, 21 NY2d 371, 376, cert den 393 US 840; Matter of Bachman v Mejias, 1 NY2d 575, 580). But, absent extraordinary changes in circumstance, the Michigan determination is entitled to great weight not only on grounds of comity but because of the great interest of the State of the children’s residence and domicile (see, e.g., People ex rel. "XX” v "ZZ”, 43 AD2d 196, 198). This is especially true since the children had always lived in Michigan until their mother lawlessly spirited them out of the jurisdiction (compare Matter of Berlin v Berlin, 21 NY2d 371, 374-377, supra, with Matter of Lang v Lang, 9 AD2d 401, 406-409, affd 7 NY2d 1029).
This court has recognized that if the best interests of all children are to be served, the abduction of children to avoid the effect of custody decrees must be deterred (Matter of Bennett v Jeffreys, 40 NY2d 543, 550). This principle has received statutory recognition with enactment of the new Uniform Child Custody Jurisdiction Act, which will not become effective in New York until September 1, 1978 (L 1977, ch 493; Domestic Relations Law, § 75-i, subd 2). The new statute provides: "Unless required in the interest of the child, the court shall not exercise its jurisdiction to modify a custody decree of another state if the petitioner, without consent of *250 the person entitled to custody, has improperly removed the child from the physical custody of the person entitled to custody or has improperly retained the child after a visit or other temporary relinquishment of physical custody.” Both the statute and the case law, however, recognize properly that the apparent imperative to discourage abduction must, when necessary, be submerged to the paramount concern in all custody matters: the best interest of the child. Otherwise "[t]he dignity of the several courts would be preserved, but the welfare of the children would be destroyed” (Matter of Lang v Lang, 9 AD2d 401, 405, affd 7 NY2d 1029, supra).
In this case, however, the two concerns can be largely harmonized. The mother, it is true, since she has settled down in her new marriage, appears to have provided her children with a good home for over four and a half years. But the father, too, had provided the children with a good home, despite the hedging psychological testimony, that a change would be "potentially” damaging, given by the mother’s expert who never, apparently, interviewed the father. There is, moreover, no significant evidence that the children would suffer permanent damage were they returned to their father.
Of course, continual shifting of custody from one parent to another is to be avoided when possible (Dintruff v Mc-Greevy, 34 NY2d 887, 888, supra; Matter of Lang v Lang, 9 AD2d 401, 409, affd 7 NY2d 1029, supra). And, in this case, awarding custody to the father would entail another move for the children. But, in the long run, stability, perhaps even for the Uhlar children, will best be achieved by adhering to prior judicial custody determinations, absent, of course, extraordinary changes of circumstance. Their stability is surely undermined by the example of the mother’s direct action in violation of law, contempt of the courts, and humiliation of their father.
The mother’s custody of the children for the last four and a half years, without more, is not a change in circumstance sufficiently extraordinary to justify upsetting the determination of the Michigan court. If it were, a parent, having lost a custody dispute in another State, might believe that by abducting the children, secreting them in New York, and waiting for time to pass, the prior custody decree could be effectively nullified. Of course, were there no tolerable alternatives to awarding custody to the abducting parent, as, for example, if the other parent were not fit to raise the children, *251 or could not provide a suitable home, or just too many years had passed, even the unlawful act might have to be ignored (see Matter of Bennett v Jeffreys, 40 NY2d 543, 550, supra; cf. Matter of Benitez v Llano, 39 NY2d 758, 759). In this case, the alternative, awarding custody to a father who is able and eager to provide a good home for his children, is the least difficult to accept. (For a penetrating analysis with copious collection of authorities considering the almost insuperably difficult problems engendered by child-snatching and conflicting jurisdictions in determining child custody see Bodenheimer, Progress Under the Uniform Child Custody Jurisdiction Act and Remaining Problems: Punitive Decrees, Joint Custody, and Excessive Modifications, 65 Cal L Rev 978, esp pp 983, 1014.)
This case, like most child custody matters, involves a collision of principles as well as of intransigent would-be custodians of the hapless children, innocent subjects of a conflict they can never understand. The primary principle of the child’s best interest is never easily applied once the litigants themselves have succeeded in creating the disruption of shifting custody as has happened in this case. The courts can only repair, patch, and cover over, as best they can, the irreparable harm occasioned and reduce the harm to a minimum, if the minimum is discernible.
Priority, not as an absolute but as a weighty factor, should, in the absence of extraordinary circumstances, be accorded to the first custody awarded in litigation or by voluntary agreement. Similarly qualified priority should also be accorded to the judgment of the court of greatest concern with the welfare of the children, that is, the court of domicile, residence, and legal dissolution of the sundered marriage. Denigrated in rank should be the consequences of child-snatching, flight from the courts of jurisdiction, and defiance of legal process and judgments. Denigrated in rank, to some degree, should also be the natural or manipulated "satisfaction” of young abducted children with the homes where they presently abide.
Applying these principles and considering the best interest of the children the father is entitled to custody because the Michigan court so decreed, because he is a fit parent, because the mother obtained the possession of the children by lawless self-help, because the transitory harm caused by disruption past and future was caused by the mother, and because there *252 is insufficient showing that the harm to the children if they be returned to the father is any more irreparable than that caused by the mother in creating the situation in the first instance. The courts cannot assure the happiness and stability of these children; that only their parents could have done, and, hopefully, can still do.
Accordingly, the order of the Appellate Division should be affirmed, without costs.
Judges Jasen, Gabrielli, Jones, Wachtler, Fuchsberg and Cooke concur.
Order affirmed.