■ Frances A. Keating, Appellant, v Kevin G. Keating, Respondent.—In an action in which the parties were divorced by judgment dated January 21, 1982, the plaintiff wife appeals from an order of the Supreme Court, Suffolk County (Willen, J.), dated October 14, 1987, which granted the defendant's cross motion for modification of the parties' stipulation by transferring custody of the children from the plaintiff to him.

Ordered that the order is reversed, on the facts, with costs,

the defendant's cross motion is denied, and the provisions of the parties' stipulation concerning custody of the children are reinstated.

The parties were married in New York on August 26, 1972. After residing in Dix Hills, Long Island, with the plaintiff wife's parents for approximately one year, the parties moved to New Hampshire, where they resided until they separated in 1981. Three children were born of the marriage, Kendra, Kevin and Bryan, whose ages are presently 15, 12 and 8 years, respectively. The children have resided continuously with the plaintiff since 1981.

On June 24, 1982, the parties entered into a "permanent stipulation" which provided, *inter alia,* that the plaintiff was to have physical custody of the children. In 1982, after verbally informing the defendant that she intended to leave New Hampshire, the plaintiff returned to New York with the children and moved into her parents' residence in Dix Hills. As of August 1983 the defendant relocated permanently in North Carolina, where he presently resides with his second wife and their two infant children. In 1983, the parties entered into a stipulation which, *inter alia,* refined the terms and conditions of the defendant's visitation in light of the parties' new residences. Although in 1982 the New Hampshire Superior Court found that the plaintiff was interfering with the defendant's visitation, neither in the 1983 stipulation, nor at any time prior to its execution, had the defendant sought to modify the parties' agreement that the plaintiff was to retain physical custody of the children.

In 1984, after the plaintiff moved successfully to compel the payment of arrears in excess of $11,000, the defendant instituted an action in New Hampshire seeking custody of the children. Although a hearing was held in 1985, the court ultimately dismissed the action, determining that New Hampshire no longer maintained any connection with the children. In December 1985 the plaintiff commenced the proceeding at bar in which she sought arrears exceeding $20,000. The defendant cross-moved for an order awarding him custody of the children. After a hearing, the Supreme Court, Suffolk County —ignoring the recommendations of the guardian ad litem— found, *inter alia,* that the plaintiff had been interfering with the defendant's visitation, and modified the parties' stipulation by awarding custody of Kevin and Bryan to the defendant. Kendra, who was then 14 years old, was to remain with her mother in New York. The plaintiff now appeals, arguing, *inter alia,* that the court's findings with respect to the best

interests of the children were against the weight of the credible evidence adduced at the hearing. We agree.

There can, of course, be no dispute that any determination with respect to the alteration of a custody arrangement—here, one of long-standing duration entered into with the defendant's acquiescence—must be rendered with the best interests of the children as the paramount consideration *(see,* Domestic Relations Law §§ 70, 240; *Friederwitzer v Friederwitzer,* 55 NY2d 89; *Eschbach v Eschbach,* 56 NY2d 167). Among the factors to be considered prior to the modification of the parties' stipulation are the quality of the home environment and the parental guidance the custodial parent provides for the child *(Eschbach v Eschbach, supra,* at 172; *Matter of Ebert v Ebert,* 38 NY2d 700, 702); the ability of each parent to provide for the child's emotional and intellectual development *(Porges v Porges,* 63 AD2d 712, 713, *lv denied* 45 NY2d 710); the financial status and ability of each parent to provide for the child *(Eschbach v Eschbach, supra);* the relative fitness of the respective parents, as well as the length of time the present custody has continued *(Matter of Nehra v Uhlar,* 43 NY2d 242). Moreover, as this court has observed, " 'priority in a custody dispute should be given to the first parent who was awarded custody * * * by voluntary agreement' " *(Robert C. R. v Victoria R.,* 143 AD2d 262, 264, quoting *Richman v Richman,* 104 AD2d 934, 935; *see also, Friederwitzer v Friederwitzer, supra,* at 94; *Matter of Nehra v Uhlar, supra,* at 251). It is well settled, furthermore, that the courts will not disrupt sibling relationships unless there is an overwhelming need to do so *(see, Eschbach v Eschbach, supra,* at 173; *Matter of Ebert v Ebert, supra,* at 704; *Obey v Degling,* 37 NY2d 768; *Matter of Jones v Payne,* 113 AD2d 968, 969; *Pawelski v Buchholtz,* 91 AD2d 1200). Although the findings of the hearing court in respect to the modification of child custody are to be accorded great respect *(see, e.g., Eschbach v Eschbach,* 56 NY2d 167, *supra),* "[a]n appellate court would be seriously remiss if, simply in deference to the finding of a Trial Judge, it allowed a custody determination to stand where it lacks a sound and substantial basis in the record" *(Matter of Gloria S. v Richard B.,* 80 AD2d 72, 76; *Skolnick v Skolnick,* 142 AD2d 570). Such is the case at bar.

It is notable, initially, that the record is bereft of evidence which indicates that the defendant—here seeking custody responsively by cross motion—is the superior or preferred custodial parent. In fact, the parties themselves manifested an entirely contrary perception of their respective parenting

abilities, inasmuch as they executed stipulations under which it was agreed that the plaintiff would assume the duties of primary custodial parent *(cf., Eschbach v Eschbach, supra; Matter of Long v Scism,* 143 AD2d 95).

Nor, as suggested in the report of the guardian ad litem, is there evidence which indicates that an alteration of the parties' custodial arrangement will enhance the welfare of the children *(see, Friederwitzer v Friederwitzer, supra* at 94-95; *Matter of Ebert v Ebert,* 38 NY2d 700, *supra; Obey v Degling,* 37 NY2d 768, *supra; Matter of Garcia v Doan,* 132 AD2d 756, 757, *lv dismissed* 70 NY2d 796; *Pawelski v Buchholtz,* 91 AD2d 1200, *supra; Martin v Martin,* 74 AD2d 419, 427). Indeed, the record contains evidence to the contrary. Aside from the importance of maintaining stability in the children's long-standing living arrangements *(see, Friederwitzer v Friederwitzer, supra; Matter of Nehra v Uhlar,* 43 NY2d 242, 248-249, *supra)* and the evidence which indicates that the children have developed a strong, loving relationship with their grandparents, who reside with them, it stands uncontradicted, as recounted by plaintiff's psychologist—who conducted extensive clinical testing of the children—that a change in custody will likely produce deleterious emotional effects, especially with respect to eight-year-old Bryan, who was only approximately three months of age when the defendant left the marital residence and who, therefore, has never resided with the defendant as principal custodian. It is notable that the Court of Appeals has observed in this respect that, "[t]he courts should be reluctant to transfer custody of young children who have been with their mother since birth" *(Aberbach v Aberbach,* 33 NY2d 592, 593; *see also, Alan G. v Joan G.,* 104 AD2d 147, 153). Furthermore, the plaintiff's psychologist was firm in his conviction that any attempt to separate the children would be inadvisable and potentially harmful. The accuracy of his assessment was subsequently reflected in the in camera statements of Kevin and Kendra, the parties' then-11-year-old son and 14-year-old daughter, who themselves expressed anxiety when confronted with the possibility of separation.

Although the defendant produced no expert witness at the hearing, the Supreme Court, in rendering its findings, chose to ignore key testimony provided by the plaintiff's psychologist and instead relied upon testimony adduced in a 1985 New Hampshire proceeding, supplied by a psychologist who, in April of 1985, spent a total of one hour examining two of the parties' three children. The transcript of the New Hampshire proceeding further reveals that this psychologist last inter-

viewed the plaintiff in 1981 and that he had performed no formal psychological testing or evaluations during the brief interviews of the children he conducted in 1985.

There exists, moreover, a question with regard to whether the defendant would be available to provide the children with the degree of attention and care to which they have grown accustomed. Indeed, this court has recently noted that, "[c]onsideration must also be given to the availability of a parent to tend to the children's needs and to participate in their development. Custody options which allow for the direct care and guidance of children by a parent rather than by third parties are naturally preferred" (Jacobs v Jacobs, 117 AD2d 709, 711). The evidence at bar establishes that, by virtue of his employment duties which necessitate frequent travel, the defendant will be away from his home in North Carolina for substantial periods of time, the practical effect of which will be to entrust custody of the children to the defendant's second wife Elizabeth, who is also employed part time and must additionally care for two small children of her own. It is significant in this regard that the report of the guardian ad litem expressed concern that Elizabeth Keating "may not have time to supervise" the parties' children as well as her own while the defendant is at work and further noted "it may be safe to assume that if the court granted custody of the children to Mr. Keating, Elizabeth Keating would be the primary caretaker". The record further indicates, and the guardian ad litem's report notes, that the defendant's home will require substantial structural modification in order to accommodate the full-time residence of Kevin and Bryan.

Nor do we concur in the Supreme Court's finding that the record with respect to the plaintiff's alleged interference with visitation creates a factual predicate sustaining an alteration of the plaintiff's status as custodial parent. Although the Supreme Court credited, in toto, the defendant's allegations—disputed by the plaintiff—regarding the alleged obstruction of his visitation, the record, when reviewed dispassionately, is inconsistent with the claim of systematic and unyielding interference advanced by the defendant. Moreover, it appears that much of the acrimony surrounding the transfer of custody prior to the defendant's periods of visitation can be attributed to the defendant's decision to relocate in North Carolina. For example, while a dispute arose with respect to whether the children—one of whom was under six years old at the time—should be permitted to fly unaccompanied to North Carolina, the record reflects that the plaintiff's reluctance to

permit unaccompanied flight was attributable to her concern for their safety and, at one point, the effects of a chronic ear infection afflicting the youngest child, whose physician had counseled against air travel. In any event, to the extent that interference with visitation was established by the defendant, the incidents involved were isolated and not, under the circumstances, of a nature which necessitates the modification of the parties' custody arrangement (cf., Alexander v Alexander, 112 AD2d 121; Fontaine v Smielak, 92 AD2d 880).

Further, the record does not support the Supreme Court's conclusion that the plaintiff embarked upon a campaign calculated to poison the children's relationship with the defendant and that she literally employed them as "collection agents" by involving them in monetary disputes between her and the defendant. Indeed, when questioned during the in camera interviews regarding the plaintiff's alleged discussion of financial matters and comments regarding the defendant, the children's responses failed to support the defendant's claims that the plaintiff had spoken derisively of him or had persistently involved the children in disputes concerning money. Although Kendra and Kevin did recall—after the court specifically mentioned it—an incident involving Kendra's demand that the defendant purchase an expensive pocketbook for her, Kendra also spontaneously and unequivocally recounted that the plaintiff had always encouraged her and her brothers to love the defendant.

Additionally, the Supreme Court's characterization of the plaintiff as consistently involving the children in her disputes with the defendant over money omits reference to the plaintiff's allegations that the defendant had repeatedly failed to discharge his financial obligations under the parties' stipulation, which was determined by the New Hampshire Court to have resulted in accumulated arrears of approximately $11,000, as well as arrears in tutoring payments for the children.

Further, with respect to the plaintiff's relocation with the children to New York from New Hampshire in July of 1982 the defendant himself testified that it was understood—and indeed discussed during the negotiation of the parties' June 24, 1982, stipulation—that the plaintiff would eventually relocate in New York, where, it should be noted, she neither concealed herself and the children from him nor denied him access to them (cf., Clarke v Clarke, 101 AD2d 911). Moreover, despite the alleged impropriety of the plaintiff's removing the children in 1982 to New York—concerning which she testified

she had informed the defendant verbally—and the defendant's protestations that she had been disrupting his visitation since 1981, the defendant nevertheless executed a stipulation dated June 27, 1983, under which the plaintiff's status as custodial parent remained unaltered. In any event, the paramount consideration is whether, under the totality of the circumstances, the best interests of the children will be served by altering the parties' stipulation with regard to custody (see, e.g., Fontaine v Smielak, 92 AD2d 880, supra), a precept implicitly recognized by the guardian ad litem when, in his report he properly concluded that "because the major showing of the mother's lack of fitness was over the visitation the father had with the children * * * and because of Kendra's and Kevin's preference [to reside with the plaintiff] it is respectfully submitted that the best interests of the children lie in maintaining custody in Frances Keating".

We note, furthermore, that the Supreme Court's memorandum decision contains references to the plaintiff's personality which appear to imply that she is afflicted with certain psychological deficits tending to negate her fitness as a custodial parent. The record, however, reveals that the principal source of this dubious commentary was the defense counsel's cross-examination of the plaintiff's psychologist, who, it should be noted, rejected any suggestion of pathology in the plaintiff's behavioral patterns and testified, in substance, that the plaintiff's behavior reflected the normal range of concerns preoccupying any parent under the circumstances. Also unsupported by the record in our view is the Supreme Court's determination that the children were not "well cared for", and that the plaintiff "lacked the requisite fitness to raise the children", findings contradicted by the evidence, as reflected by the guardian ad litem's report, in which the guardian stated that, "despite substantial direct examination and cross-examination there was nothing to substantially detract from [plaintiff's] abilities as a mother". Moreover, on three separate occasions the guardian's report specifically stated that the children were "well cared for" and cited this finding as a factor underlying his recommendation that the plaintiff retain custody of the children.

Also of significance in balancing the parties' respective abilities to assume the role of primary custodian is the plaintiff's testimony that the defendant on numerous occasions had physically assaulted her, in consequence of which the plaintiff sought and was granted an order of protection in 1981. Although the defendant himself conceded that he had struck the

plaintiff in the face on at least one occasion in the presence of the parties' daughter and a friend and while 14-year-old Kendra stated during the in camera interview that she had seen her father hit her mother many times and had noticed bruises on her body, there is nevertheless absent from the court's discussion consideration of the foregoing behavior as affecting the children's emotional well-being and the defendant's fitness to assume the role of custodial parent. We note that the in camera interviews of the children contradict the dissenter's assertion that the children were "coached", inasmuch as each child, when questioned by the Trial Judge, denied that he or she had been instructed by the plaintiff to express a specific custodial preference.

Although it is our view that the order appealed from represents an improvident exercise of discretion which should be set aside, we remind both parties that they are to abide by the provisions of their stipulations with regard to support, visitation and matters pertaining to custody of the children. Kooper, J. P., Sullivan and Harwood, JJ., concur.

Balletta, J., dissents and votes to affirm the order with the following memorandum: The majority seeks to disregard the extensive hearing held in this matter and substitute its own judgment for that of the Trial Judge. I respectfully disagree with the majority decision and would vote to affirm the order of the trial court which transferred custody of the two youngest children from the plaintiff to the defendant.

It would appear that the majority has assumed certain facts to be true even though they were sharply disputed at the trial. As an example, the majority suggests that the plaintiff moved the children from New Hampshire "after verbally informing the defendant that she intended to leave New Hampshire" (at 676). In fact, however, this version of the facts was sharply disputed by the defendant, who related how the plaintiff had absconded with the children in August of 1982. Moreover, the New Hampshire court, after a hearing, found the plaintiff to be in contempt for refusing to allow the defendant visitation and for removing the children from the State without consulting with the defendant first. In addition, two years later, in 1984, the New Hampshire court issued a second contempt order against the plaintiff for her continuing efforts to disturb the defendant's "right of access to his children". The order repeated the observation made by the New Hampshire court in 1982 that the plaintiff had "not dealt in good faith throughout this entire custody/visitation issue".

In determining whether a custody award should be modi-

fied, the issue is whether the totality of the circumstances warrants a modification in the best interests of the child *(Friederwitzer v Friederwitzer,* 55 NY2d 89; *Walden v Walden,* 112 AD2d 1035). Since such an inquiry depends to a very great extent upon assessments of credibility of the witnesses and upon assessments of the character and temperament of the parents, the findings of the hearing court must be accorded great respect *(Eschbach v Eschbach,* 56 NY2d 167; *see also, Matter of Irene O.,* 38 NY2d 776; *Ira K. v Frances K.,* 115 AD2d 699).

In *Friederwitzer v Friederwitzer* (55 NY2d 89, 94, *supra)* the Court of Appeals provided some guidelines for determining when a modification of custody may be appropriate: "Thus, we noted that 'Paramount in child custody cases, of course, is the ultimate best interest of the child' * * * that stability is important but the disruption of change is not necessarily determinative * * * that the desires of the child are to be considered, but can be manipulated and may not be in the child's best interests * * * that self-help through abduction by the noncustodial parent must be deterred but even that 'must, when necessary, be submerged to the paramount concern in all custody matters: the best interest of the child' * * * that the relative fitness of the respective parents, as well as length of time the present custody had continued, are also to be considered * * * that 'Priority, not as an absolute but as a weighty factor, should, in the absence of extraordinary circumstances, be accorded to the first custody awarded in litigation or by voluntary agreement' * * * whereas of lesser priority will be the abduction, elopement or other defiance of legal process, as well as the preferences of the child" (citing *Matter of Nehra v Uhlar,* 43 NY2d 242).

Since the best interests of the children lie in being nurtured and guided by both of their natural parents *(see, Daghir v Daghir,* 82 AD2d 191, *affd* 56 NY2d 938; *Twersky v Twersky,* 103 AD2d 775), the noncustodial parent and his children jointly enjoy a natural right of visitation. "Indeed, so jealously do the courts guard the relationship between a noncustodial parent and his child that any interference with it by the custodial parent has been said to be 'an act so inconsistent with the best interests of the children as to, per se, raise a strong probability that the [offending party] is unfit to act as custodial parent' " *(Daghir v Daghir, supra,* at 194, quoting *Entwistle v Entwistle,* 61 AD2d 380, 384-385; *accord, Leistner v Leistner,* 137 AD2d 499).

In the instant case the trial court made a careful and

studied review of the relevant factors *(see, Eschbach v Eschbach, supra,* at 174), and it is clear that there has been substantial and significant interference with the relationship between the defendant and the children by the plaintiff. The defendant proved that the plaintiff had absconded with the children, continually interfered with his visitation rights, with his mail and telephone communication with the children, that she maligned him, damaged the children's emotional and psychological development, imbued them with an unhealthy sense of materialism and selfishness (indeed, Kendra once threatened suicide unless the father bought her a $300 pocketbook) and demonstrated contempt for the judicial process by lying to and misleading the court.

Thus, it has been shown that the plaintiff had a long and virtually uncontested history of disrupting the defendant's visitation rights. In addition, there was ample evidence—for example, the incest article—that the plaintiff was subverting the children's love for their father. The plaintiff was unable to produce any evidence of similar efforts on the part of the defendant. Thus, viewing the plaintiff's actions as a whole, it is clear that there has been a change of circumstances sufficient to justify modification of the original custodial arrangement *(see, Matter of Ebert v Ebert,* 38 NY2d 700, 703-704).

The majority seems to find it significant that the parties had originally stipulated to award custody to the plaintiff, and that this original stipulation is therefore somehow forever written in stone. Although it has often been held that priority should be given to the first award of custody, whether made by a court or through stipulation of the parties *(Friederwitzer v Friederwitzer, supra; Walden v Walden, supra),* an award pursuant to a voluntary agreement between the parties is entitled to less weight than an award resulting from the trial court's judgment *(Friederwitzer v Friederwitzer, supra),* since the latter represents a considered determination based upon all of the factors involved. In any event, this factor is certainly not determinative of the issue *(Walden v Walden, supra),* especially in a case such as this where the plaintiff shows such a contemptuous disregard for the agreement and for court orders. Indeed, the testimony at the hearing was to the effect that when the plaintiff moved to New York with the children, she told the defendant that the visitation agreement no longer applied.

In addition, the majority refers to the apparent preferences of the children to reside with their mother, as stated in the in camera interviews. While the expressed preference of a child

is a factor to be considered *(Eschbach v Eschbach, supra),* it is obvious from the transcript of the in camera interviews that the children were coached to say they wanted to remain with the mother. For example, Kevin told the Trial Judge that he took seriously his grandmother's statement that if he went to his father's, she would never see him again. Indeed, the plaintiff's own expert testified that Kendra would now do or say anything just to achieve her own ends, and acknowledged the possibility that she might have been "programmed" to prefer her mother.

The majority also places great stock in the testimony of the plaintiff's hired expert and tends to denigrate the opinions of the only experts who had dealings with both parties and the children. The plaintiff's expert examined only the plaintiff, the children and the maternal grandparents, and never examined the defendant or his current wife. Thus, the plaintiff was able to conceal vital information from him, and he was unable to substantiate many of the claims made by the plaintiff. He purportedly verified some of the claims by talking to the plaintiff's parents, a source of obviously dubious value. On the other hand, the only two individuals who were independent of the parties, Dr. Derby, a psychologist appointed by the New Hampshire court, and Mr. Bianco, the guardian ad litem appointed by the New Hampshire court, both recommended in 1985 that the defendant be given custody of the children. Both men had been appointed by the courts in 1981 and had had extensive contact with both parties and the children.

This court recently reversed a trial court order that changed custody of the four children of a marriage from the mother to the father *(see, Skolnick v Skolnick,* 142 AD2d 570). This court noted that there was insufficient evidence to support the conclusion that the problems surrounding the father's visitation were entirely the mother's fault, and ordered a second, more complete independent psychiatric evaluation of the parents. It also stated that at the new custody hearing the court should concentrate on the ultimate best interests of the children, which this court believed had not been given the appropriate consideration.

In the instant case the mother had a long, virtually uncontested history of disrupting the father's visitation rights. In addition, there was ample evidence that the mother was subverting the children's love for their father. The mother produced no evidence of similar efforts on the part of the father. Thus, in contrast to the situation in *Skolnick,* the evidence indicated that the visitation problems were due

entirely to the mother. In addition, the trial court considered the best interests of the children in making the decision it did, and, after a thorough review of the children's circumstances, it determined that the children's interests would best be served by a change in custody (see, *Friederwitzer v Friederwitzer, supra,* at 94; *Matter of Nehra v Uhlar, supra).*

The trial court did not award custody of Kendra to the defendant because it did not want to tell a 14-year-old girl where she had to live. The plaintiff contends that the children should not have been separated from each other. Although the courts usually avoid separating siblings in order to encourage close familial relationships (see, *Matter of Ebert v Ebert, supra,* at 703), when it is clear that the best interests of each child lies with separate parents, a split custody decree is proper (see, *Matter of Estes v Estes,* 112 AD2d 568, 569; *Wurm v Wurm,* 87 AD2d 590, 591, *appeal dismissed* 56 NY2d 886).

The defendant works full time, and most of the time his second wife would be home with the children. The plaintiff argues that this is tantamount to giving custody to a third person. However, it is clear that the defendant is intensely interested in his children and their upbringing. Although he lived in North Carolina, he kept in frequent, even daily, telephone communication with them. In addition, he flew the children to North Carolina as much as possible, despite the formidable obstacles the plaintiff posed. For example, she required that he fly to LaGuardia Airport rather than Newark to pick up the children and bring them back. Another time he flew to Newark to pick up the children for Thanksgiving vacation, but the plaintiff did not bring the children, and the defendant had to fly back to North Carolina without them. It is clear that the defendant is a concerned and loving parent and will provide direct care and guidance to the children (see, *Jacobs v Jacobs,* 117 AD2d 709, 711).

In contrast, the plaintiff also works, leaving the children in the hands of her mother, who was always making derogatory remarks about the defendant to the children. The plaintiff herself frequently complained in front of the children about the defendant's alleged failure to give her enough money. One time the defendant came to the house to pick up the children and the plaintiff berated him in the driveway demanding money while the children were standing there. In addition, the plaintiff and the children reside in the maternal grandparents' house, portions of which are leased to rent-paying tenants. All in all, the current living circumstances of the children can hardly be called conducive to their general physical

and mental health and well-being. Indeed, whereas three years ago the children were well-behaved and doing well academically, today Kevin is barely average in school and Bryan has developed severe behavioral and learning problems, while Kendra is anxious and stressful.

Thus, the trial court herein clearly considered the best interests of the children after thoroughly reviewing their circumstances when it determined that their interests would best be served by a change in custody *(see, Friederwitzer v Friederwitzer, supra; Matter of Nehra v Uhlar, supra)*.