Matter of W.L. v A.E. (2006 NY Slip Op 50601(U))

[*1]

Matter of W.L. v A.E.

2006 NY Slip Op 50601(U) [11 Misc 3d 1077(A)]

Decided on March 27, 2006

Fam Ct, Nassau County

Lawrence, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected in part through April 17, 2006; it will not be published in the printed Official Reports.

Decided on March 27, 2006

Fam Ct, Nassau County
In the Matter of a Proceeding Under Article 6 of the Family Court Act W.L., Petitioner,
 against
A.E., Respondent.
V-

MARK JACOBS, ESQ.
Attorney for Petitioner - W.L.
BRENT ALBALA, ESQ.
Attorney for Respondent - A.E.
DENISE LANGWEBER, ESQ.
Law Guardian

Richard S. Lawrence, J.
Petitioner Father seeks custody of two minor children, Adam and Brenda born respectively , 1992 and , 1996. He alleges that there has been a change in circumstances since a prior settlement in this Court whereby the Respondent Mother obtained legal and physical custody and the Father was granted liberal visitation.
A final order of custody and visitation was entered in this Court on November 21, 2001. On January 22, 2004 this Court ordered temporary custody of both children to the Father and liberal visitation to the Mother.
This matter was tried over a period of many months, and addressed both the issues of change of circumstances as well as best interests of the children; it was not a bifurcated trial.
 TESTIMONY OF THE FATHER
The Father testified that he owns the home where he is living together with his wife, the two children involved in the matter at bar, and two other children from his wife's first marriage(ages 16
and 17 at the time of the testimony), as well as an additional child (age 2) who is the issue of the Father's marriage to his current wife. The Father has been gainfully employed for many years in the concrete industry. The Father met the Respondent Mother during 1990 or 1991 and had a romantic relationship with her. The parents separated in late 1996 or 1997.
The Father stated that the instant petition was filed because the Mother cannot devote the necessary time for the children's education, school, and their needs. She becomes aggressive with the children and she leaves them unattended. He further alleges that the children never had a "steady person" to take care of them after school and at home and that they have been left unattended approximately 6 - 7 times, without adult supervision.
The first time was when the Father was working and Adam called him to say he was alone and hungry. The Father received permission from his employer to check on his son and went to the child's home.
He found his son with three other children, playing Nintendo, without food and without adult supervision; he called the police. He also attempted to call the Mother three times, but was unable to reach her. The Father then took all three children to the local police precinct and then took them for sandwiches. Upon her return from work, the Mother went to the police precinct; at that time the Father had already taken Adam to his (the Father's) home, and only then returned him to the Mother.
Approximately two weeks prior to this incident, both children were also left alone. The Mother had given Adam five dollars to buy Chinese food and he was told to go to the store to get food, which he did, together with his sister. The children then were playing alone until the babysitter, Lisa, arrived, after the children had been alone for over eight hours. The Father spoke to the Mother regarding this and told her not to leave the children alone.
The Father further testified that the children were further left unattended at other times for "short periods" when the Mother "had to go out." The Mother told the Father that on these occasions she was working, although the Father did not believe her. This caused the Father to take the children more often and visit with them more often. On one occasion the Father would surreptitiously follow the Mother and also check on the children. On various occasions he saw the Mother not at work but with friends of hers on the second floor of the apartment building where they live. On each occasion when he did follow her, she was not going to work.
During September 2003, the Mother called the Father to take the children for a visit, as she had to work. The Father did this, but he then saw the Mother shopping in a store, and not working.
When the children play, the Mother pays no attention to them. Her form of discipline is to yell in order to "calm them down" and sometimes she hits them.
The Mother assaulted Adam on one occasion and this was investigated by Child Protective Services. The Father took Adam to his home; there were marks on his hand where the Mother had hit him with a belt. She would also "throw" him out of bed, push him and pull his hair. Since the order of custody in 2001, the Father has devoted more time with the children. He reads them books, reviews their homework and is engaged in their activities. Also included in these activities is the Father's wife.[*2]
Regarding the children's education, the Father has met with their teachers and in fact was scheduled for a meeting this very day (when the Father testified) with one of Adam's teachers. Both children are good students.
The Mother has given the children absolutely no religious training. Both parties are Catholic and the Father goes to Sunday mass. Both Adam and Brenda have attended religious classes with the Father, and both children were baptized a week ago, due to the Father. He is also planning on their First Communion in the future.
The Father told the Mother about the baptism, one month in advance, and invited her to participate. She said nothing to him and did not appear. On that very day he called her again to attend the baptism, with an offer for her to participate, and she refused.
On cross-examination by the Mother's attorney, the Father stated that Adam called him when he was left unattended during
the summer of 2003. However, this had also occurred between six and seven times previously. The Father found out about this because at the time he was living in the same building as the Mother, and he heard about this from other tenants. He would check on the children by "stopping by" every day after work in order to see if the Mother was back from work. This occurred between 5:30 p.m. and 6:00 p.m. In addition, the Father's friends in the build-ing would also check.
When the children were left unattended during the summer of 2003, they were with two children of a Ms. "A"; she was to be the babysitter that day. The Father asked where she was and the children told him that she went to the "99 cent" store and that there was no other adult in charge. The children further told him that the Mother was with Ms. "A". The Father then called the police twice and they arrived at about 12:50 p.m. Adam told the police that the Mother had been working and had left in the morning; the other children told them that their mother was shop-ping at the "99 cent" store and would be back at 2:00 p.m. The "A" family lived in the next apartment to the Mother. At 2:00 p.m., when still no other adult arrived, the Father took all the
children to Blimpie's for food and then to the police station in order to see what to do. The Father also called the Mother at work, only to find out that she was not working that day. The Father then took the children back to the apartment and knocked on Ms. "A's" door; there was no answer. The Father then called[*3]
CPS, and at its suggestion, took the children to his home at 3:40 p.m. Ms. "A" came back at 3:40 p.m.; she had been shopping with Brenda, another lady and two other girls. The day Adam was left alone and Ms. "A" was to babysit, Brenda was with Ms. "A" and was not left alone. The three children in the Mother's apartment were Adam and Ms. "A's" two children. The Father asked Ms. "A" if she was supposed to be watching the children and she said "yes." At that point, the Father took both Adam and Brenda to his home. The Mother then called the Father's home at 4:30 p.m. and a police sergeant also called him, stating that since the Mother had custody he would have to bring the children back. However, the Father did not do this at the time because CPS had told him to "keep" the children. The very next day, CPS sent a caseworker to the Father's home.
 TESTIMONY OF THE FATHER'S WIFE
The Father's second witness was N.L., who is the current wife of the Father. Under the current temporary order, both Adam and Brenda reside with this witness and the Father, together with the wife's daughter and son (ages 15 and 7) from her prior relationship and Karen, now two years old (at the time of the testimony) who is the daughter of N.L. and the Father. Ms. L. and the Father own the home where they currently live and she is self-employed cleaning houses. Her earnings from the prior year were approximately $25,000.00.
This witness has no relationship whatsoever with the Mother and has only had a few conversations with her, at which times the Mother called to speak to the Father or the children, and insulted Ms. L.
During the eleven months (as of the date of her testimony) that the children have lived with her, she has noticed a number of changes. The children used to have "bad habits." For example, they would eat with their mouths open, would not sit down while eating, did not respect adults, would yell at each other, would not go to bed when requested, and wanted to watch TV. Ms. L. further testified that the program at school was not "proper" for them,
especially for Adam, who constantly argued, did not like to read, and gave his Father and Ms. L. an argument every day. He only wanted to eat sweets and not "healthy foods" and insisted on being part of adult conversations.[*4]
Adam further would refuse to shower and had to be told several times to bathe. He used to have headaches, but rarely so now. Today, Adam has greatly improved in all respects. He reads 30 minutes a day without having to be told, and he asks permission to speak when adults are speaking. He knows when to go to sleep, says his prayers and watches only "proper" television programs. Both Brenda and Adam adhere to their schedules regarding play time, study time, TV time and supper time.
When the children first arrived 11 months ago, they did not have any prayers to say. Now, they are "inculcated with love for God." Adam goes to catechism classes every Sunday and then mass. The Father has taught both children regarding their religious studies.
The children are also involved in extra curricular activities since they have been with Ms. L. and the Father, including karate, and after school programs including the computer center, the home-
work center and extra help. Brenda also goes for story time.
Both Ms. L. and the Father attend teacher meetings for both children; the Mother does not attend.
The household has " a lot of love" and the children are very affectionate to their Father. He helps them with their school assignments, and asks them about their day in school. Ms. L. further states that the Father is "more loving than males generally are in her [Hispanic] culture.'"
Regarding the December 2003 incident, Adam told Ms. L. that there was not much food in the Mother's home and he confirmed what the Father had said regarding the situation at home. It was Ms. L. who called CPS to inform them that the children were left alone and CPS, Albany, told her not to leave Adam alone.
On cross-examination by the Mother's attorney, Ms. L. stated she has been married to the Father almost four years now; that previously the children "did not have manners" but do now; and that, according to their teachers, who spoke to Ms. L., the children did not do well in school, but are doing well now.
On cross-examination by the Law Guardian, Ms. L. stated that Adam's teachers have stated that he is doing very well in school, is behaving better and has the capacity to do even better.
Regarding visitation with the Mother over the last 11 months, both Ms. L. and the Father "encourage" it.
The children both know about this trial. Neither Ms. L. nor the Father told them about it and the children stated that the Mother told them. The children further said that the Mother stated to them that if the Court gives custody to the Father, that the Mother would leave and never see them again. Adam was worried and not happy, because he loves his Mother. Ms. L. stated that both she and the Father have told Adam that he must love and respect his Mother.[*5]
 TESTIMONY OF THE MOTHER
The Mother testified that her employment consists of house cleaning from 8:00 a.m until 2:30 p.m. or 3:00 p.m., Monday, Wednesday, Thursday and Friday.
Regarding the incident of December 20, 2003, she testified she went to work that morning and the children were at home. She left at 8:30 a.m., leaving the children with her older daughter, Melissa E., who was then 21 years old. Brenda was still asleep when the Mother left and Melissa planned to stay until 9:30 a.m., when she had to go to work. At that point, the Mother told Adam (then 11
years old) that at 9:30 a.m. he was to go to the babysitter at 10:00 a.m.; the babysitter lived in the next apartment. Her name is Alice D. and the Mother had made arrangements with Ms. D. for this to be done.
Ms. D., nicknamed "Alice," has been the babysitter since November or December 2003. She has sat every week and when Brenda went to school at 11:00 a.m. she put her on the bus and the Mother then picked her up. The Mother then testified that there was never any problem with Alice.
On the date in question, the Mother left her cell phone with Adam. At 11:00 a.m. he called her and said he was in his apartment playing with Alice's children and that Alice was in her own apart-ment; the Mother then told Adam to go to Alice's apartment. On the date prior, the Mother asked the Father to stay with the children on the date in question and the Father said he could not; the Mother considered this "a threat" to her.
The Mother then called Adam at 12:00 noon; he was then in Alice's apartment. Alice had never left the children alone before; the Mother never gave the children money to buy food; the Mother did not give $5.00 to the children to buy Chinese food; and she
never gave them permission to cross Hempstead Turnpike to buy such food - all in contradiction to the Father's earlier testimony. (The Court notes that this testimony appeared to be for only one incident and not the two separate incidents to which the Father testified.)[*6]
The Mother denied that as of December 2003 the children had any behavior problems, other than sometimes they did not wish to eat dinner - but then they always did eat.
When the Mother returned to her apartment on December 20, at approximately 2:35 p.m., she found the children gone and there was a note on the table to call CPS. She then went next door to Alice's apartment and Alice said the Father had called the police because the children were left alone in the apartment. The Mother then went to the police station, where the police asked if she had left the children alone in the morning; she said she had not, that she had left them with Alice. At that point, the police called the Father to bring the children to Alice's; the Father said he would not and that he would keep them.
Introduced into evidence as Respondent's Exhibit A, were three photographs of Adam, taken by the Mother on December 30th. They show three distinct scratch marks on Adam's right chest. On December 29, 2003, Brenda told the Mother that the Father's wife had scratched Adam: Adam went to open the refrigerator, as he was hungry; the wife said to wait, Adam opened the refrigerator again, the wife grabbed him and scratched him and yelled at him to stop opening the refrigerator. Adam also told the Mother that the wife had scratched him.
On cross-examination by the Father's attorney, the Mother testified that in addition to the three houses she had where she was employed, she had since secured two additional houses.
On the date in question, the Mother spoke to Alice the night before to ask her to watch the children because the Mother had to work that Saturday (she normally does not work on Saturdays). Prior to that date, there was a "set schedule" with Alice to babysit on the days the Mother worked. Alice agreed to watch the children and did not tell the Mother that she would have to go out. Living with Alice at the time were her own four children, ages 20 or 21, 19, 5 and 3 or 4, and her husband.
On December 20, when Melissa E. left, Brenda was still sleeping and the Mother told Adam that when Brenda woke up, they were to go next door to Alice.
The Mother testified that she had never left the children alone before.
When the Mother called the children at 11:00 a.m., she heard Alice in the background. Adam also told the Mother at 11:00 a.m. that both he and Brenda had eaten, at which point Alice took the telephone and told the Mother that the children were all right and had eaten. Alice never said she was going out and did not say that she would take Brenda when she went out.
On December 20th, the Mother had left food for the children in her apartment, consisting of milk and cereal; that the Mother [*7]had cooked the day before; and she also left food with Alice. There also was chicken for lunch and additional food in the pantry.
The Mother found out that Alice had gone shopping with Brenda and left the other children (Adam and Alice's younger children) in her apartment, when she (the Mother) came back from work. The Mother had left a contact telephone number for Alice, but she
received no calls from her and no calls either from the Father. The Mother testified that the Father did not know where the Mother worked and that he had no telephone number to contact her at work.
Later, when the Mother spoke to Alice, Alice said that when the Father called the police, the children were with her oldest son (20 years old) and that when he went to take a shower, the children then went back to their own apartment, as Adam had a key to that apartment.
On the other days that the Mother worked, she would bring Brenda to Alice at 9:30 a.m.
When the children were with her, she did homework with Adam, consisting of math and reading. However, the Mother did not read English so she could not help much and Melissa E. was the one who really helped the children.
When the Mother arrived home at 2:30 p.m. on December 20th, she found a note to call CPS. She made that call, but was given no information. She then went next door to Alice who told her that the Father had come with the police and taken Adam. Thereafter Alice had come home and the Father said he would also take Brenda.
The Mother pays the babysitter weekly, about $40.00 or $50.00 per week depending upon how many days she works. The sole baby-sitter is Alice D. who has her own children, ages 9, 5 and 3, and also a 20 year old son who was also living with Alice. Alice takes care of her own children and the Mother's, but nobody else.
The Mother is "always" home when Adam comes home from school. [*8]Brenda stays with Melissa E. until Melissa E. has to leave for work at which time she then takes Brenda to Alice each day. If the Mother is not home by the time Brenda comes home from school, then Alice would pick her up at the bus stop and take her to her apartment.
The Mother states that someone is "always" home when each of the children comes home from school.
The Mother admits that between December 2001 and December 2003 she has hit Adam with a belt, but only two or three times and it did not leave any marks. The reason for this was that Brenda was jumping on the bed and also that Adam did not obey her. The belt was Brenda's, a small one with a buckle. The Mother's discipline of the children usually is to deprive them of TV and there were no other physical means used other than the two or three times with
the belt. The Mother denies ever causing any bruises on Adam's hand and never heard him complain about being alone or without food; she states that there "always" is food in the house.
The Mother denies ever pulling Adam by his ear and says that it was only the Father who did that. Furthermore, Adam never went out at night in order to obtain food. During the incident of December 20, Alice's 20 year old son was watching the children, but the Mother was not aware of this until after the fact.
 THE FATHER'S REBUTTAL WITNESS
The Father called, as his rebuttal witness, a babysitter. This person has worked for him for 3 years in that capacity.
Regarding the scratches upon Adam (Respondent's Exhibit A in evidence, consisting of 3 photographs), that happened approxi-mately 3 months prior to this witness' testimony. She stated that Adam went to the kitchen, where the Father's wife was. Adam then was looking in the refrigerator, took a sandwich, ate it and started joking with the wife. While they were both joking
around, Adam turned toward the wife and the wife, who has long fingernails, scratched him. It was totally an accident.[*9]
 TESTIMONY OF THE CHILDREN
 The Court held in camera interviews with each of the chil-
dren. Due to the confidential nature of their testimony, this Court will not review it in this decision.
 THE LAW GUARDIAN
The Law Guardian recommends custody to the Father, with libe-ral visitation to be arranged by the parties. She further recom-mends that all parties participate in counseling, especially regarding corporal punishment. She states Adam is in treatment, but Brenda is not and should be.
 DISCUSSION OF THE TESTIMONY AND FINDINGS
Regarding credibility, the Court finds that both the Father and his wife were extremely credible. As to the Mother, the Court finds that she is less than credible, and that she has not given the children the attention they deserve, both legally and practically. The Court also finds that the Father's babysitter, who testified as his rebuttal witness, was extremely credible.
For purposes of appeal, regarding the testimony of the children, the Court wishes to advise that it found Adam (age 12 at the time of his testimony) credible, especially with respect to
the incidents at issue; and it did not find Brenda (age 6 at the time of her testimony) credible whatsoever.
The Court finds that the Mother had inflicted corporal pun-
ishment upon Adam, and perhaps Brenda also, and that she has left them unattended for approximately nine occasions, two of which were testified to at length by the Father.
 The Mother admittedly uses corporal punishment, by means of a belt; she admittedly does not help the children with their home-work; she has neglected the children's religious education, and there was virtually no testimony from the Mother that she interacts with the children in almost any respect. In addition, the Mother never disputed that she refused to attend the children's baptism; and she gave no reason whatsoever for this.
The Father, together with his wife and home environment, impresses this Court as a loving, caring and generous person, who has attended to every facet of the children's lives. This should be contrasted with the Mother, who has left the children with
untrustworthy caregivers, which put the children at great risk. The Mother also admittedly left the children alone on December 20, knowing that her daughter Melissa E. had to leave, and left it up to the children to go next door to the babysitter when Brenda woke up. It is interesting to note that the Mother did not deem it necessary to ask Alice to go to the children's apartment after Melissa E. had left.
Regardless of which party has had custody, visitation did not appear to be a problem with the non-custodial parent, and the parties appeared to have been able to agree on liberal visitation.[*10]
 APPLICABLE LAW
Taken as a whole, the Court finds that changed circumstances have in fact been proven by the Father. See Ortiz v Ortiz, 6 AD3d 619 (2d Dept 2004) and Johnson v Johnson, 309 AD2d 750 (2d Dept 2003).
After changed circumstances have been found, the Court then must address the best interests of the children.
In a case remarkably similar to the matter at bar, the Family Court found changed circumstances and changed custody from the mother to the father, and the Appellate Division unanimously
affirmed the order. In the Matter of Ortiz v Maharaj, 8 AD3d 574 (2d Dept 2004). In that matter, the mother subjected the child to corporal punishment; due to the mother's work schedule the child was not adequately supervised in her absence; the child's school work suffered while in the mother's custody; the father was found better able to provide the child with the structure he needed; the law guardian urged that the child live with the father; and the child's behavior improved while in the father's temporary custody. This Court has found every one of these elements to exist in the case at bar.
In another relevant case, the trial court was affirmed when it changed custody, based upon the child's poor grades and disci-plinary problems in school, plus corporal punishment consisting of use of a belt on two occasions, when with one parent, compared with the child's improvement, including involvement with his church, when with the other parent. In the Matter of Hagans v Harden, 12 AD3d 972 (3d Dept 2004), appeal den'd 4 NY3d 705 (2005). A decline in a child's health, together with an unstable home environment, has been held sufficient to constitute a change in circumstances (Munson v Lippman, 2 AD3d 1252 (3d Dept 2003)); and although not a changed circumstances case, where one parent is more responsive to the children's needs, custody to that parent is appropriate. Morrow v Morrow, 2 AD3d 1225 (3d Dept 2003). 
The Court should change custody only when the totality of the circumstances warrants modification in the best interests of the children; there is no one factor, in most cases, which is determi-native in making such an award. Friederwitzer v Friederwitzer, 55 NY2d 89 (1982); Eschbach v Eschbach, 56 NY2d 167 (1982); and Keating v Keating, 147 AD2d 675 (2d Dept 1989), appeal dis'd 74 NY2d 79 (1989).
It is well settled that a moving party seeking a change in custody must show a sufficient change in circumstances reflecting a real need for change in order to insure the best interests of the child. Canrike v Kasson, 291 AD2d 680 (3d Dept 2002); Fox v Fox, 177 AD2d 209 (4th Dept 1992); McCauliffe v Peace, 176 Ad2d 382 (3d Dept 1991); and Winslow v Lott, 295 AD2d 620 (2d Dept 2002).[*11]
Generally speaking, the custodial parent is given priority in order to maintain and promote the stability in the children's lives. Matter of Ellen K. v John K., 186 AD2d 656 (2d Dept 1992) and Matter of Lobo v Muttee, 196 AD2d 585 (2d Dept 1993).
However, where the custody is the result of a stipulation, as it is in the matter at bar, it is entitled to less weight then if it were a disposition after a plenary trial. Friederwitzer v Fried-erwitzer, supra; Robinson v Robinson, 111 AD2d 316 (2d Dept 1985), appeal den'd 66 NY2d 613 (1985); and Feltman v Feltman, 99 AD2d 540 (2d Dept 1984). Furthermore, the Father here has had temporary custody of the children for over two years, and this must also be taken into account. Matter of Nehra v Uhlar, 43 NY2d 242 (1997); Krebsbach v Gallagher, 181 AD2d 363 (2d Dept 1992), appeal den'd 81 NY2d 701 (1992); see also Eschbach v Eschbach, supra; Ring v Ring, 15 AD3d 406 92d Dept 2005) and Vann v Vann, 14 AD3d 710 (2d Dept 2005).
An important factor in custody determination is the ability of each parent to guide and provide for the child's intellectual and
emotional development. In this, the Court finds the Father has been exemplary, and the Mother far less than adequate. Matter of Esterle v Dellay, 281 AD2d 722 (3d Dept 2001); Matter of Hrusovsky
v Benjamin, 274 AD2d 674 (3d Dept 2000); Matter of DeLosh v DeLosh, 235 AD2d 851 (3d Dept 1997), lv den'd 89 NY2d 813 (1997); and Matter of Alice A. v Joshua B., 232 AD2d 777 (3d Dept 1996).
In addition, the Court must include such factors as care and affection shown to the children; the stability of each parent; the atmosphere of the respective homes; the ability and availability of each parent; the prior award of custody; the possible effect of a custodial change on the children; and the parents' past perform-ance. See Matter of Saunders v Saunders, 60 AD2d 701 (3d Dept 1977); and Eschbach v Eschbach, supra.
Although priority is accorded to the first award (Frieder-
witzer v Friederwitzer, supra at p. 94), nevertheless, it is only one factor to be weighed by the Court in deciding whether a change of custody is warranted. See Eschbach v Eschbach, supra and Friederwitzer v Friederwitzer, supra.
Here, the Court has weighed each and every of the elements necessary, and finds that the Father, the Father's home, the
Father's home environment, and the Father's parental guidance as custodial parent, all clearly outweigh those of the Mother, and that the best interests of the children are served by granting custody to the Father. See Eschbach v Eschbach, supra; Matter of Ebert v Ebert, 38[*12] NY2d 700 (1976); Cuccurullo v Cuccurullo, 21 AD3d 983 (2d Dept 2005); and Morrow v Morrow, supra.
It is hereby
ORDERED, that custody of the children, Adam and Brenda shall be with the Father, effective immediately, and that the Mother shall have liberal visitation, such visitation to be as agreed between the parties.
This constitutes the Findings, Decision and Order of this Court after hearing.
Dated: Westbury, New York
 March 27, 2006
TO:

[*13]