OPINION OF THE COURT
Stella Schindler, J.
This is a Family Court Act article 6 custody proceeding in which two sets of paternal relatives are vying for custody of their orphaned nephew Adam, 6V2 years old. The child presently resides with paternal aunt and uncle Carol and Thomas M. (Carol and Thomas),* who are the respondents in this action. Paternal aunt and uncle, Florence and Eugene B. (Florence and Eugene), petitioners, who currently have frequent, liberal visitation with Adam are seeking his custody.
*346 The court is being asked to decide between two sets of sincerely motivated relatives each committed to providing stability and love to a child who has suffered the tragic losses of his mother, father and grandmother, and who was then physically abused by his teenage half sister.
PRIOR HISTORY
The background of this case is set forth in detail to fully elucidate the trauma and chaos surrounding this very young child’s life.
Adam was born on April 29, 1985 and lived in Brooklyn with his mother, grandmother, and half siblings. In August 1989, Adam’s mother died of AIDS, and two weeks after that, Adam’s grandmother also died. Left in the home was Adam, who was then four years old, his half siblings Samantha, Matthew, Olga and Olga’s child. Olga was the ostensible caretaker. It should be noted that Adam’s father rarely if ever resided with the family. In the next four months, Adam remained in the household until a complaint was made to the Child Welfare Administration (CWA) alleging that Olga had bound and burned Adam’s hands, and Olga’s boyfriend had stabbed him in the head. Adam’s father, who was dying of AIDS and residing upstate with his niece and nephew Thelma and Howard M. (Thelma and Howard) was notified. On January 4, 1990, at his behest, Carol and Thomas, went to Olga’s residence, removed Adam, and took him to their home where he has resided for the past 21 months.
Eight months after Carol and Thomas took Adam, Thelma and Howard instituted the first custody petition before this court naming as respondents, Carol and Thomas and Adam’s dying father.
(Parenthetically, about four months before he died of AIDS-related pneumonia, Adam’s father filed a paternity petition before this court and an order of filiation was entered posthumously.)
Thelma and Howard alleged that Carol was not able to adequately care for Adam due to her mental and physical illnesses. That matter was not adjudicated because Thelma and Howard decided not to proceed, but during the pendency of that action a Mental Health Report (MHS) and an investigation and report (I&R) were prepared. Both these forensic reports and subsequent updates were submitted into evidence in the instant proceeding.
*347 This then is the second petition for Adam’s custody. Florence and Eugene commenced this petition against paternal uncle Thomas (Florence’s brother) and his wife Carol alleging, inter alla, that Carol’s physical and mental illnesses preclude providing the child with suitable care. Petitioners state they "are willing and able to care for the child and to provide him with a suitable environment.”
Throughout the pendency of this proceeding, Carol and Thomas have had custody of Adam, and Eugene and Florence have had liberal visitation.
A lengthy fact-finding hearing was held. Petitioner’s case consisted of the testimony of petitioners Florence and Eugene, and respondent Carol who was called by petitioner’s attorney as a witness.
Respondent’s case consisted of the testimony of three witnesses: Carol and Thomas, and Sharon Joseph, Adam’s treating therapist. Adam’s kindergarten progress report dated August 12, 1991 was received into evidence as respondents’ exhibit A.
Both sides cross-examined the maker of the MHS, Dr. Robert Nussbaum, a senior staff psychologist with the Mental Health Clinic. His MHS consisting of three separate reports was admitted into evidence as court exhibit 1. Two I&R reports were also admitted into evidence as court exhibits 2 and 3, respectively.
The court interviewed the child in camera in the presence of his Law Guardian on two separate occasions.
FINDINGS OF FACT
What follows is an analysis of each litigant which is drawn from the testimony adduced at trial and the exhibits in evidence.

Florence and Eugene

Petitioners Florence and Eugene are married, own their own home in Brooklyn and have a 20-year-old son. Before Adam was removed from Olga’s household in January 1990, they visited with him a scant few times a year. However, after Adam came to live with Carol and Thomas, in part because of Carol’s physical limitations, he spent considerably more time with the petitioners, in such activities as shopping, going to the library, and eating out. Florence is a concerned, responsible, mature woman. She contends she is healthier than her *348 sister-in-law and "can do everything for Adam” rather than have "outsiders” take him to school or help him with homework, which she believes is "unfair to the child.” She stated that an earlier back problem no longer bothers her and that she had stopped working as a medical assistant in anticipation of taking care of Adam.
Florence indicated she is pursuing this case in large measure because it was her brother’s dying wish that she and her husband should raise Adam.
Florence also submits that she and Eugene can better provide for Adam; her husband is employed as a foreman with the Sanitation Department and receives health benefits which would include Adam.
Florence agrees that her sister-in-law Carol also loves Adam. When asked if Adam should be removed from respondents’ home even if he wants to stay there, she answered that he had "probably been manipulated by them.”
Florence said if she were awarded custody, she would be the primary caretaker since her husband works full time. She stated that Adam has spent a great deal of time with her over the last year including an entire month when Carol was sick. She described her relationship with Adam as "very warm”.
Eugene presented himself as a pleasant, likeable man— supportive of his wife, and concerned about Adam’s welfare. He said that the reason he and Florence did not take Adam to live with them in January 1990 was because Carol and Thomas heard of the abuse first and had already removed the child. Although he noted that he and his wife had intended to immediately commence a custody petition, certain events — he was suffering from shingles and Florence had a bad back— precluded this.
Eugene admits that he is sure Carol and Thomas love Adam too, and states "they’re decent people”. Nonetheless, he feels that his sister-in-law’s problems limit her functioning, and submits that Adam’s father was aware of this before he died.
Eugene maintains that although his relationship with the respondents is strained, if he were to be awarded custody of Adam he would not deny the respondents visitation.
Eugene testified that his relationship with Adam was very good and included baseball and working on school projects together. He has no disabilities and is prepared to accept full financial responsibility for Adam. Both petitioners said if *349 Adam were to live with them they would continue his therapy and would comply with liberal visitation to Carol and Thomas.

Carol and Thomas

The testimony and MHS of Carol revealed an emotional woman with a degree of underlying depression, and a number of serious medical issues. She has a prior psychiatric history and confirmed that she had attempted suicide in July 1990. Carol noted that the stressors which led her to attempt suicide included the loss of 70% of her eyesight as a result of diabetes (for which she takes insulin), and her brother’s untimely death from cancer.
Carol reported she has been in therapy for approximately eight years. After the attempted suicide, a counselor from the Lighthouse for the Blind came to her home once a week to help her learn how to cope with her loss of vision.
Regarding her husband’s family, Carol maintained that when Adam’s father was alive, she complied with court-ordered visitation between Adam and his father, which she and her husband supervised. She denied interfering with her in-laws’ access to Adam, although she claimed Adam resisted seeing Eugene and Florence because he wanted to remain with her.
Dr. Nussbaum testified that Carol no longer has suicidal tendencies, and he was not concerned with any future suicide attempts. Her one attempt was the result of her difficulty in coming to terms with her physical limitations, but with therapy and counseling, she should continue to be an effective caretaker.
Dr. Nussbaum further added that Carol and Thomas are threatened by Eugene and Florence’s court action, and if Adam’s custody were to be decided in favor of Carol and Thomas, a major stress in Carol’s life would be alleviated. Despite some degree of friction between the parties, visitation with Eugene and Florence has been ongoing with no indication of any problem.
Regarding her mental and physical condition, Carol confirmed she takes the prescribed drug Prozac once a day, experiences no side effects, and is not depressed when she takes the medication. She has been in therapy at the New Hope Guild Center for about one year, and at Dr. Nussbaum’s suggestion she has taken a course in parental counseling. Carol has also come to terms with her limited vision and *350 completed a course in mobility training and home economics under the auspices of the Lighthouse for the Blind to enhance her self-sufficiency both inside and outside her home. She now wears thick glasses and walks with the assistance of a cane, both of which enable her to function safely.
Carol testified that she can now travel alone by bus or by train. With the proper magnifying device she can also read. As far as daily chores are concerned, she stated that only snow or ice would prevent her from walking Adam to school seven blocks away. In inclement weather she has arranged for a neighbor to accompany Adam in the morning and the school principal has arranged to have him transported home in the afternoon.
Carol sees herself as Adam’s mother and never feels depressed while she is caring for him. She continues to receive therapy at the New Hope Guild Center and also meets with Adam’s therapist one day each week. She describes a child who has made good progress in her home. For example, he used to bang his head or throw himself on the floor when frustrated, and he no longer does this. Adam’s kindergarten progress report (received into evidence as respondents’ exhibit A) confirmed that Adam was "doing good work in class”, that his "thinking and writing skills are on grade level” and that "he has made many strides this year.” The teacher also noted that "he still needed guidance and has trouble getting along with his peers,” although there had been some improvement.
Carol noted there had been friction between her and her sister-in-law Florence, but that when Adam visits with the petitioners, "I feel he’s in safe hands.” Carol pointed out that she and her husband are successfully raising their only child, a 17-year-old boy who is a high school senior. Moreover, her son plays with Adam, helps him with homework, and acts in all respects as a sibling.
Carol stated that she loves Adam very much and is fully aware of the traumas he has suffered. At the court’s direction, she takes Adam for therapy.
The testimony and MHS of Thomas revealed a hard-working, family oriented man. Thomas is a truck driver who makes daily long distance runs. He and Carol own their own home, and he reported no health problems or psychiatric history. Thomas believes his sister Florence was motivated to petition for custody because she feels "she could do a better job”, but also claimed that when Florence and Eugene were offered *351 custody of Adam when his mother died they declined because Florence was working at the time. There were also conflicting assertions made by all the parties as to the dying wishes of Adam’s father regarding his child’s custody.
Thomas stated that "Adam is where he wants to be * * * we love Adam * * * we can do anything [the petitioners] can.”
Regarding allegations that Adam is not well supervised because of his wife’s visual limitations and the proximity of their home to the water, Thomas asserted that Adam either plays in the fenced-in backyard, inside the house, or at the home of a friend up the block. Thomas testified that he and Adam fish together, play ball, and go for rides in the tractor trailer. He said his wife would be Adam’s primary caretaker with assistance from him and their teenage son. Thomas said that Adam does not always want to visit Florence and Eugene, but he is encouraged to do so.

Adam

Adam was interviewed by Dr. Nussbaum twice. After the first interview, Dr. Nussbaum described Adam as a "good looking, slim, intelligent, personable five year old boy who appears slightly older than his stated age.” Adam was concerned with issues of power and control, but Dr. Nussbaum saw this as age appropriate. Adam stated he was in kindergarten, and has "a lot of friends but also some enemies.” He stated he had been living with his mother before she died. He did not remember much about her, and said he didn’t think about her. He said he saw his sick father "sometimes,” but initially identified Thomas as his father. He stated he would like to continue living with Carol and Thomas.
Adam was interviewed again four months later. By that time, his father had died, and Adam stated his father was "in heaven.” He related some of the abuse he suffered, complaining that "the baby sitter was getting bad * * * she stabbed me and my brother in the head with a knife.” Adam says that Carol and Thomas are good to him and "let me go to my friends.”
Regarding Eugene and Florence, Adam said he has visited with them on Saturdays and Sundays for quite awhile. He spoke favorably of them, noting they "buy me stuff,” and stated they own a house and he likes it there. However, he was clear about wanting to remain with Carol and Thomas, and to continue at the same school with the same teachers. He also wanted to continue visiting Florence and Eugene.
*352 Dr. Nussbaum’s final recommendation was that Adam should remain with Carol and Thomas. He stated that instability has permeated Adam’s childhood, and to disturb his present living situation would cause the child irreparable harm. Moreover, Carol and Thomas are whole-heartedly interested in Adam, he is comfortable in their home, and there is genuine fondness. In addition, he opined that Adam should have continued, frequent visitation with Eugene and Florence who, as noted earlier, also love Adam and are invested in his welfare.
Social worker Sharon E. Joseph testified that her first contact with Adam was in January 1991, when respondents brought him to the New Hope Guild Center as the result of a referral from the Queens Family Court. Psychological intervention was required because Adam was exhibiting severe emotional behaviors which included temper tantrums; headbanging, attempts to destroy property; provocative behavior designed to make people reject him; self-deprecation; impulsivity; and acting moody, shy, withdrawn or aggressive in school.
Ms. Joseph testified that initially when Adam was brought to the Center he had extreme difficulty separating from Carol and Thomas, but as time went on he was able to separate, and through play therapy he began to deal with the losses of his closest family members and the abuse he suffered afterwards. She stated that Adam has stabilized and made good progress. He is less aggressive, and can verbalize his anger. He is also less hyper-vigilant, e.g., he no longer runs to the window to look for Carol and Thomas during the sessions, and is better able to handle frustration. Most importantly, he has learned to say "goodbye” at the end of each session, a sign that he is dealing with some of his separation anxiety.
Ms. Joseph testified that Adam is psychologically bonded to the respondents and calls them "Mom and Dad.” He also refers to his cousin as his "brother.” She also noted that Adam had a positive experience with Eugene and Florence when he was on vacation with them.
The court interviewed Adam twice. The first interview was brief. Adam was uncommunicative and would not make eye contact. His sadness and loneliness were clear and very painful to observe. The second interview, some seven months later, was vastly different. Adam was happy. He was communicative and talked about kindergarten, how proud he was of his report card, and that he wanted to return to the same school. *353 He named his friends on the block, listed his favorite foods and activities, and said he enjoyed riding in his "Dad’s” truck. He likes living with his "Mom and Dad and brother and doing things with them,” but expressed an interest in visiting more often with his siblings Matthew and Samantha. Adam said he enjoyed his visits and vacation time with Florence and Eugene, and offered that he has friends there also.
CONCLUSIONS OF LAW
A petition for the custody of a minor may be commenced by anyone who has an interest in the child’s welfare. (Matter of Smith v Lascaris, 106 Misc 2d 1044 [1980]; Matter of Humphrey v Humphrey, 103 Misc 2d 175 [1980].) In nonparent custody proceedings such as the one at bar, those who have been granted standing to file custody petitions are the relatives of an orphaned child (Matter of White v White, 118 AD2d 336 [1986]).
The sole criterion to be applied in custody disputes is the best interests of the child (Matter of Lincoln v Lincoln, 24 NY2d 270 [1969]; Friederwitzer v Friederwitzer, 55 NY2d 89 [1982]; Eschbach v Eschbach, 56 NY2d 167 [1982]), while the needs and interests of the adult parties are secondary. (McIntosh v McIntosh, 87 AD2d 968 [1982].)
Among the myriad factors encompassed by the best interests standard is the psychological, economic, social and familial background of the parties (Matter of Van Dyck v Van Dyck, 97 AD2d 909 [3d Dept 1983]; Hatz v Hatz, 97 AD2d 629 [3d Dept 1983]); and the stability, financial capability and lifestyle of each party. (Matter of Wallinger v Wallinger, 96 AD2d 988 [3d Dept 1983]; McIntosh v McIntosh, 87 AD2d 968 [3d Dept 1982]; Matter of Saunders v Saunders, 60 AD2d 701 [3d Dept 1977].)
The courts will also consider the parties’ ability to provide for the child’s physical needs (Sandman v Sandman, 64 AD2d 698 [2d Dept 1978]), although the fact that one party can provide the child with more material advantages than the other is neither controlling nor determinative. (Matter of D’Alessandro v Parisi, 60 AD2d 897 [2d Dept 1978]; Matter of Metz v Morley, 29 AD2d 462 [4th Dept 1968].)
The best interests standard also addresses the child’s social, emotional and intellectual development in the custodial home. (Bluemke v Bluemke, 155 AD2d 574 [2d Dept 1989]; Eschbach v Eschbach, supra.)
*354 Where neither party is unfit, the courts oppose shifting custody in order to maintain the child’s stability and avoid further disruption in the child’s life. (Matter of Nehra v Uhlar, 43 NY2d 242 [1977]; Matter of Fountain v Fountain, 83 AD2d 694 [3d Dept 1981], affd 55 NY2d 838 [1982]; Aberbach v Aberbach, 33 NY2d 592 [1973]; Miller v Miller, 74 AD2d 663 [3d Dept 1980].)
The child’s preference, although not dispositive, is another factor to be considered. (Matter of Sooy v Sooy, 101 AD2d 287 [3d Dept 1984]; Matter of Cornelius C. v Linda C., 123 AD2d 536 [1st Dept 1986]; Eschbach v Eschbach, supra; Matter of Ebert v Ebert, 38 NY2d 700.)
In Matter of Kreslein v Hanley (157 AD2d 659 [2d Dept 1990]), the court held that a child would remain with his guardian’s family, where he had psychologically bonded to them, and told the court-appointed psychiatrist that he wanted to remain. Moreover, the psychiatrist testified that "a change in custody would pose a risk of psychological trauma to the child, whom the doctor described as torn and emotionally disturbed by the prospect of being removed from the appellant’s custody.” (Supra, at 660.)
Based on the foregoing principles of law and the testimony adduced at trial, which included information from the Child Welfare Administration, Mental Health Services, the child’s treating therapist and the child’s Law Guardian, it would be a relatively simple matter for the court to grant custody to Carol and Thomas. The court’s finding would be supported by evidence that Carol and Thomas have been empathetic caregivers, and have consistently nurtured Adam both physically and emotionally for the past 19 months. They are economically secure and have the financial resources to provide Adam with a comfortable life-style. Adam is doing well in school, making progress in therapy, and has bonded with the respondents and their son. At present, Carol’s medical condition does not significantly affect the love, care, attention and nurturing she provides for Adam. Neither her physical handicaps nor her prior depression prevent her from meeting Adam’s need for stability and security at this time.
However, Carol’s serious and ongoing medical condition precludes such a decision. Carol’s prognosis for good long-term health is not good. At approximately age 40, she has already suffered the debilitating and serious affects of diabetes. While the court is impressed with the progress she has made, it must *355 confront the awful reality that there will come a time when Carol may be unable to care for Adam. Further, Thomas cannot be considered as a primary caretaker; because of his work schedule he is away for long periods of time.
Considering the record before it, the court is persuaded that Adam loves Carol and Thomas and Eugene and Florence, and that they love Adam. All the parties are currently fit and appropriate caretakers who harbor little acrimony for one another. The testimony shows that when ordered to do so, they can set aside their differences and work together to ensure Adam’s well-being.
Therefore, for all the reasons already stated, it is in Adam’s best interests to have continuing, meaningful and frequent access to both sets of relatives.
It is well-settled law that an award of joint custody is only appropriate in cases involving relatively stable, civilized people who can engage in joint decision making in this child’s best interests. (Spain v Spain, 130 AD2d 806 [1987]; Braiman v Braiman, 44 NY2d 584 [1978]; Dodd v Dodd, 93 Misc 2d 641 [1978]; Perotti v Perotti, 78 Misc 2d 131 [1974].)
In Matter of Martin v Martin (113 AD2d 943 [1985]), the Appellate Division, Second Department, held that an award of joint custody was appropriate, where there were some difficulties between the parties, but there was an absence of severe antagonism. Likewise, in Matter of Venable v Venable (122 AD2d 374 [1986]), the Appellate Division, Third Department, denied an application for modification of a joint custody order, stating that both parties love the child, can adequately care for him, and "there is no indication that the parties are incapable of communicating with one another concerning their child”.
Based on the applicable case law and the facts before it, this appears to be a case of first impression: a custody dispute over an orphaned child between relatives of equal standing and fitness where the court is prepared to issue an order of joint custody.
Rather than "sever the living child in two and give the one half to the one woman and the other half to the other” (1 Kings 3:25, New World Translation of the Holy Scriptures [Rev 1984]), the court has decided to unite the caretakers and keep Adam whole and stable by jointly granting petitioners’ application for custody and respondents’ cross-petition for custody, with physical custody to remain with Carol and *356 Thomas. Should there come a time when Carol is no longer able to physically care for Adam, physical custody would revert to Eugene and Florence. Both parties are to be involved in continued decision making for the child.
The court also orders that visitation with Eugene and Florence be continued and enhanced with extended visitation to be arranged between the parties for Adam’s school holidays and summer vacations.
In addition, Adam is to remain in a therapy program and continue to deal with his past losses and to address any concerns he may have regarding Carol’s health. His Law Guardian is directed to explain the court’s decision to Adam and to his therapist so that the therapist can respond to any questions Adam may raise.

 The parties’ first names are used throughout this decision for ease of reference and imply no disrespect.