K.D. v J.D. (2004 NY Slip Op 50814(U))

[*1]

K.D. v J.D.

2004 NY Slip Op 50814(U)

Decided on June 30, 2004

Family Court, Suffolk County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on June 30, 2004

Family Court, Suffolk County
K.D., Petitioner,
against
J.D., Respondent.
V-16584-03

FOR PETITIONER: Dana Koos, Esq., 1757 Veterans Mem. Hwy., Islandia, New York 11749. FOR RESPONDENT: Marion Polon, Esq., 300 Rabro Drive, Hauppauge, NY 11788. Kathy B. Small, Esq., LAW GUARDIAN, 800 Veterans Mem. Hwy., Hauppauge, NY 11788.

Barbara Lynaugh, J.
By petition dated 9/29/03, petitioner-father K. D. seeks to modify a judgment of the Supreme Court, Suffolk County (Whelan, J.), entered 8/12/03, which, upon an incorporated stipulation dated 5/5/03, awarded custody of the parties' two children, K., born 8/23/96, and S., born 10/18/99, to respondent-mother J. D.. Father now seeks custody alleging that the safety of the children is endangered because mother is being physically abused by her live-in boyfriend in the presence of the children.
Having heard the evidence offered at the hearing, having conducted a lengthy in camera interview with the children, and having reviewed the written recommendations of the Law Guardian, and with thorough and careful consideration, the court makes the following findings and conclusions.
Pursuant to the parties' divorce judgment, the children had been residing with mother up to 9/27/03. On that day, father got a phone call from mother, who was vacationing in Florida. Mother asked father to pick up the children from the home of babysitter Maria Cruz because Ms. Cruz was unable to handle the children. Ms. Cruz had also called father that day with the same request. Father retrieved the children from the home of Ms. Cruz on 9/27/03. The children have been in the temporary custody of father since that date pursuant to various consensual interim orders entered during the pendency of this proceeding.
There is a history of certain events herein which pre-date the parties' judgment of divorce of August 2003 and predate their marital stipulation of May 2003. These events relate to [*2]mother's relationship with her live-in boyfriend Jose Andino. They demonstrate the beginnings of a pattern of domestic violence which has been occurring and continues to occur in mother's household up to the present time. Mother raised no objection to this testimony during the hearing and, in fact, elicited some of this information during her direct case.
These factors are being considered because they are necessary for a proper understanding and evaluation of the present circumstances and such an understanding is essential in reaching a determination regarding the safety and welfare of these children. There has been no prior best interests finding, custody having been previously awarded upon consent of the parties. To disregard this evidence on mere procedural grounds, particularly when there were no objections regarding its admissibility, would be an abdication of this court's duty to these children.
The parties separated in February 2001. In early 2002, mother, then age 26, began a relationship with Jose Andino, then age 22. On 5/31/02, mother called the police to her home after an incident between herself and Mr. Andino. Mother testified that this was only a "verbal dispute." However, in her report to the police on that date and in a subsequent sworn statement to the police, mother stated that Mr. Andino had punched her in the mouth and cut her lip.
When confronted with the inconsistencies between her sworn testimony and her sworn statement, mother, upon advice of counsel, invoked her right against self incrimination. This was one example of the many inconsistencies in mother's testimony regarding her relationship with Mr. Andino. It also depicts mother's ongoing attempts to minimize and/or deny the extent of the violence occurring in her home and the impact it has had on the children.
Mr. Andino was arrested as a result of the 5/31/03 incident. Mother received a temporary order of protection from the First District Court on 6/2/02, which directed that Mr. Andino refrain from any criminal offense against her.
On 8/13/02, that order of protection became permanent for one year upon
Mr. Andino's conviction of harassment in the second degree [PL §240.26(1).]
Mother testified that Mr. Andino moved into her home sometime in August 2002 and that he moved out "with the first order of protection." However, Mr. Andino remained in the home for months after this order was issued, moved out briefly, and was thereafter allowed to move back in.
On 10/17/02, mother again called police to her home, alleging that
Mr. Andino had violated the order of protection and assaulted her by pushing her face into a door, which he had ripped off its hinges moments earlier. Mr. Andino pushed mother into the door with such force that it caused the door to break, caused her to fall against the breaking door, and caused her to sustain bruising and swelling to the left side of her face. In her statement to police, mother went on to describe Mr. Andino as "screaming, yelling, punching holes in the walls" before the assault and as "very violent...[he] tried to cut his wrist with a knife" after the assault. When police arrived, Mr. Andino was again arrested.
[*3]
On 10/21/02, a temporary order of protection was issued by the District Court directing that Mr. Andino stay away from mother and refrain from any criminal offense towards her. On 12/11/02, that order of protection, with all the same terms, was made permanent through 12/11/05 upon Mr. Andino's conviction of criminal contempt in the second degree [PL §215.50.]
When mother was asked why she obtained an order of protection against Mr. Andino, she again invoked her right against self-incrimination. When asked again about the period of time during which Mr. Andino resided with her after August 2002, i.e., the date of Mr. Andino's first conviction and the first permanent order of protection, mother gave four different answers. One of the answers was March 2003, i.e., five months after the issuance of the October 2002 order which directed Mr. Andino to remain away from mother.
Stating that her relationship with Mr. Andino had improved, on 6/10/03, mother submitted a sworn motion to the District Court requesting that the order of protection against Mr. Andino be vacated. It is unclear whether such a vacatur order was ever issued.
What is clear, despite her testimony to the contrary, is that mother's relationship with Mr. Andino and his physical abuse of her continued long after the incident of October 2002. On 2/15/03, father picked up the children for visitation and saw bruises on mother's arms and shoulders. When asked by father whether she had been hit by Mr. Andino, mother replied, "it's none of your business." During July 2003, father again observed bruising on mother's face, lips, and eyes.
In August 2003, mother reported to father that she had gotten an order of protection against Mr. Andino and that he was gone from her life. Shortly thereafter, father observed Mr. Andino to be residing with mother when he brought the children back from visitation.
On 9/25/03, Mr. Andino was at mother's home to receive the children following father's visitation. Father observed Mr. Andino yelling at S., then age 3, for walking too slowly; both children reacted by crying and running into the home.
On 9/29/03, a report was made to the State Central Registry (SCR) alleging domestic violence in mother's home. Child Protective Services (CPS) caseworker Jody Tomlinson was assigned to investigate the SCR report and was called to testify. Ms. Tomlinson interviewed mother, father, Mr. Andino and the two children. Mother admitted to Ms. Tomlinson that she had been in the company of
Mr. Andino in September and October 2003, notwithstanding the existence of the order of protection which directed Mr. Andino to remain away from her.
Mother told Ms. Tomlinson that she had never being beaten by Mr. Andino and said they had only been in "shuffles." Mother further reported to
Ms. Tomlinson that earlier in September 2003, there had been what mother described as a "verbal incident" between herself and Mr. Andino while the children were upstairs. Ms. Tomlinson then obtained police records regarding this incident, which mother had reported to the [*4]police on 9/5/03. Mother reported that Mr. Andino had punched her, kicked her, and caused her to sustain yet another bloody lip. Mr. Andino was arrested a third time.
Ms. Tomlinson interviewed the children, whom she described as "credible." The children indicated they had been present, watching as their mother was being punched and kicked by Mr. Andino. K., age 7, had a very vivid and terrifying recollection of this and another similar incident.
On 12/4/o3, upon review of Ms. Tomlinson's investigation by a CPS supervisor, the SCR report was "indicated" for inadequate guardianship neglect against mother and Mr. Andino predicated upon domestic violence in the presence of the children. CPS made a further finding that neither mother nor
Mr. Andino had abided by the 12/11/02 order of protection.
At trial, mother repeatedly referred to Mr. Andino as her "ex" and her "former boyfriend." She claimed not to know his whereabouts because his family would not provide her with that information, indicating she had made such an inquiry. As she did with the CPS investigator, mother also tried to minimize the extent and the impact of the violence in her home. At one point in her testimony, she said that the children were "never present" during the times that Mr. Andino was abusive to her, that they were always "away or at school." Her own reports to the police regarding the 5/31/02 and 9/3/03 incidents contradict this statement.
There are just so many inconsistencies and invocations against self-incrimination throughout mother's testimony regarding her relationship with
Mr. Andino so as to render her entire testimony in this regard wholly unworthy
of belief.
Near the closing of her testimony, mother assured the court that she would prevent Mr. Andino from having any further contact with the children. This was nothing more than an empty promise. There has been such an order in effect since December 2003. Mother, who has demonstrated her propensity to disregard other court orders, apparently feels that this court's orders are entitled to no more recognition than those of the District Court.
As can be seen in the Law Guardian's recommendation, the children reported during the in camera interview that Mr. Andino is still residing with mother, he is present when they visit, and mother is pregnant with his child, a little morsel of information that mother failed to disclose to the court. Given what should be the closely guarded confidentiality of an in camera interview, the court would not normally disclose the source of this information. However, the Law Guardian has already served a copy of her closing statement on counsel.
Father is not without his own parental shortcomings. While the children were residing with mother, father was less than consistent in exercising visitation and sometimes disappointed the children. For a period of time after the children began residing with him, father was not as responsive as he should have been to requests from K.'s elementary school teacher. Father is not [*5]participating fully in K.'s educational program and is apparently not supervising K.'s homework or the child's personal hygiene.
Patricia Behrens, K.'s teacher at the North Elementary School in Brentwood, has been a Special Education teacher for the past 25 years. At present, she teaches seven and eight-year-olds with learning disabilities.
Mrs. Behrens has been K.'s teacher since March 2002.
K. is classified as Learning Disabled, Level 3; he has behavioral and educational deficiencies. K.'s behavioral deficiencies were described by
Mrs. Behrens as "verbally aggressive, oppositional and defiant." Educationally,
K. is deficient in reading retention and math recall and sequencing. K. had matured somewhat during the summer and returned to school in September 2003 less argumentative than he had been.
In mid-October 2003, Mrs. Behrens met with father when he came to pick K. up from school. She advised father that K.'s behavior was deteriorating and that he was becoming more aggressive physically and verbally. Mrs. Behrens also advised father that it was important to review K.'s homework daily and to send in $2 for the child's lunch money each week.
Despite these reminders, K.'s homework has been incomplete; the child does only that portion which he can do himself. The first time father sent lunch money to school for K. was early January 2004 when he sent in $20. Father failed to attend the parent-teacher conference which was held in November 2003. Mrs. Behrens noted that when K. resided with mother that his homework was done and that mother had been sending in K.'s lunch money prior to January.
During a court appearance in mid-December, Mrs. Behrens asked father to obtain a prescription from K.'s pediatrician for an occupational therapy evaluation of K.'s small motor skills because the child's hands were tired and aching and he was unable to write or color for any length of time. She advised father that these services were available at the school if ordered by a pediatrician. It took father two months to obtain the prescription.
Early in the school year, an emergency contact form was sent home with K., who has asthma. Father did not provide any information until 11/24/03, when he provided three names without any phone numbers or addresses. Father did provide his own cell phone and work numbers.
Mrs. Behrens also noted that K. often comes to school wearing dirty school and has a strong body odor every day, something which father has failed to address. Mrs. Behrens, who testified in February 2004, indicated that K. was "improving greatly" from Christmas to date. She described him as being "calmer, happier, more focused" and noted that he now "works [*6]independently."
In addition to his learning disability, K. has other special needs, some of which have not been addressed by either parent. Both parents describe the child as grossly overweight. Mother had taken K. to the pediatrician for this problem, enrolled the child in football, and changed K.'s food intake. She indicated that K. had begun losing weight with this regimen. Father made no mention of any measures he was taking to address K.'s weight problem.
Mother described K.'s temper tantrums, excessive crying and emotional distress since the divorce proceedings began in 1999. She noted that K. blames himself for his parents' divorce. This was also painfully evident during the in camera interview; K. is a very unhappy and remorseful young child. Mother arranged for K. to see the school psychologist, who gave mother a list of referrals. Mother did not follow through with any of the referrals, stating that she would take K. to counseling "if needed." Father failed to indicate whether he was taking any steps to arrange therapy for K..
Father, age 29, has been employed as a bus operator by the New York City Transit Authority for two years; his bus route is in Queens. His work hours vary, but his usual schedule is 7AM to 3:30PM from Sunday to Thursday. Father occasionally has to work overtime and his summer schedule varies to cover vacations. Father utilizes Aida Soto as a child care provider before and after school. Ms. Soto was the child care provider which mother had used in the past.
Neither parent provided any information regarding their financial resources at trial. The 2003 divorce judgment indicates that father's annual income is $46,400 and mother's annual income is $25,324. There is a child support obligation of $448 biweekly which is apparently still being deducted
from father's paycheck; father is also required to pay 65% of the child care costs.
Mother, age 28, has worked as an admitting clerk for Southside Hospital in
Bay Shore for the past four years. She works Wednesdays through Fridays from
7AM to 3PM and Saturdays and Sundays from 11PM to 7AM. Mother utilizes various family members and friends for childcare.
It does not appear that mother had a regular or reliable childcare provider once she stopped using the services of Ms. Soto. One of mother's childcare providers was Maria Cruz, who mother used for the first time when she left for Florida on 9/27/03. As indicated earlier, Ms. Cruz was unable to handle the children and asked father to pick them up. Another childcare provider was Jackie, who resided with mother for a period of time. On 8/20/03, Jackie was arrested after she dragged and kicked child S. in a laundromat.

There is little information in the record recording the accommodations which are available for the children at either mother's or father's home. Mother has had various tenants residing with her, including Jackie and Mr. Andino. Father resides in a home with his aunt and [*7]his cousin.
As with any determination of custody, the sole concern of the court is which resolution will best serve the interests of the subject children by promoting the children's welfare, happiness, and optimum development. Eschbach v. Eschbach, 56 NY2d 167, 451 NYS2d 658 (1982); Friederwitzer v Friederwitzer, 55 NY2d 89, 447 NYS2d 893 (1982); Nehra v. Ulhar, 43 NY2d 242, 401 NYS2d 168 (1977). Among the factors to be considered in ascertaining the best interests of the children are:
(1) the demonstrated parenting ability and relative fitness of the parties;
(2) the love, affection, and nurturing given by each party to the children, the emotional bond between the children and each party, and the willingness and ability of each party to put the children's needs ahead of his/her own;
(3) the length of time the children have lived in a stable and satisfactory environment, and the stability of the proposed custodial residence;
(4) the ability of each party to provide for the children's emotional and intellectual development;
(5) the financial resources available to each party and the ability of each party to provide the children with food, clothing, housing, and medical care;

(6) the individual needs and expressed desires of the children and the degree to which the custodial determination would either continue or interrupt the various elements of the children's day-to-day lives;
(7) the willingness and ability of each party to facilitate and encourage a close and optimum relationship between the children and the other party;
(8) any other factor deemed relevant to a particular custody dispute; e.g., domestic violence, substance abuse, and/or proposed relocation and its impact on the children. In this case, the domestic violence occurring in mother's home and its impact on the children is a most significant factor which the court must consider in reaching a determination as to which outcome would most likely serve the children's best interests. DRL §240; Samala v. Samala, 309 AD2d 798, 765 NYS2d 523 (2d Dept., 2003); Wissink v. Wissink, 301 AD2d 36, 749 NYS2d 550 (2d Dept., 2002); Bishop v. Livingston, 296 AD2d 602, 745 NYS2d 588 (3d Dept., 2002).
"The devastating consequences of domestic violence have been recognized by our courts, by law enforcement, and by society as a whole. The effect of such violence on children exposed to it has also been established. There is overwhelming authority that a child living in a home where there has been abuse between the adults becomes a secondary victim and is likely to suffer [*8]psychological injury. Moreover, that child learns a dangerous and morally depraved lesson that abusive behavior is not only acceptable, but may even be rewarded (citations omitted)." Wissink, supra.
In Scialdo v. Kernan, 301 AD2d 884, 754 NYS2d 406 (3d Dept., 2003),
a consensual custody order was modified and custody was awarded to father because of, inter alia, mother's "poor decision making" which led her to allow her husband back into the home two days after he had been removed for domestic violence that had been witnessed by the child. Husband was then arrested following a second incident of domestic violence which was again witnessed by the child.
In another custody modification case, the "unhealthy environment created by domestic violence combined with [mother's] failure to recognize the potential danger to her son by exposure to such violence" was sufficient to support a finding that a change in custody was in the best interest of the child. Bishop v. Livingston, supra.
In the case at bar, there have been numerous incidents of domestic violence in mother's home, memories of which remain all too vivid to these children. Despite her multiple lacerations and contusions and the fear now instilled in the hearts of her children, mother continues to maintain a relationship with her abuser.
From the onset of these proceedings, back in September 2003, it has been plainly evident that mother's on-going relationship with Mr. Andino was the only reason the children were removed from her care. Mother claims she wants custody, yet she has done absolutely nothing to remove Mr. Andino from her life.
This is truly tragic, because mother is the more capable parent in most other aspects. Mother is the more nurturing of the two parents, and the children have a closer emotional bond with mother. Prior to September 2003, the children had resided with mother since the parties' separation in 2001. Mother made sure that K. did his homework and went to school clean. Mother arranged the visits to the pediatrician and took appropriate action to address K.'s weight problem.
While father may have superior financial resources, he was just not as involved in the lives of his children as he should have been. The parties separated when S. was not yet two years old and K. was four. Their need to bond with their parents was crucial at that time. Father would miss scheduled visits, disappointing the children. He did not take the children for overnight visits because it would have been inconvenient. The emotional bond between the children and father suffered as a result of father's diminished involvement during these early years.
However, father was involved enough to eventually step up when he saw that his children were in danger. Father was able to put his own needs aside to see to the needs of his children. This is something that mother is seemingly unable or unwilling to do. Mother has chosen a life [*9]with her abuser over a life with her children. While mother may choose to put her own life on the line with this man, the court cannot allow the children to be similarly endangered.
In view of the foregoing, the court concludes that the safety, welfare, and best interests of K. and S. will best be served by an award of custody to father, and the judgment of the Supreme Court will be so modified.
Mother will be granted visitation with the proviso that Mr. Andino not be present. Mother is strongly cautioned that if she allows the children to come in contact with Mr. Andino she runs the risk of losing unsupervised visitation in a subsequent proceeding.
Father is reminded to cooperate with requests from the children's teachers and to make sure that homework is completed and that the children are properly bathed and provided with clean clothes on a daily basis. Father will be directed to obtain a complete mental health evaluation for K. and to follow any treatment recommendations. Both father and mother are to cooperate with the evaluation and treatment.
A separate order will enter.
Dated: June 30, 2004 
 BARBARA LYNAUGH
 JUDGE OF THE FAMILY COURT