Brendan N. v Tina Marie R. (2006 NY Slip Op 50819(U))

[*1]

Brendan N. v Tina Marie R.

2006 NY Slip Op 50819(U) [11 Misc 3d 1091(A)]

Decided on May 4, 2006

Family Court, Suffolk County

Lynaugh, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on May 4, 2006

Family Court, Suffolk County
Brendan N., Petitioner,
against
Tina Marie R., Respondent.
 V-18696-03/06/E/F

COUNSEL FOR PETITIONER
Sari Martin Friedman, Esq.
666 Old Country Road
Suite 704
Garden City, New York 11530
COUNSEL FOR RESPONDENT
Kevin G. McClancy, Esq.
Legal Aid Society of Suffolk County
889 East Main Street
Riverhead, New York 11901
LAW GUARDIAN
Stephen R. Hellman, Esq.
1235 Montauk Highway
Mastic Beach, New York 11950

Barbara Lynaugh, J.
Petitioner-father Brendan N. and respondent-mother Tina Marie R.. have each filed a petition seeking a modification of an order of this court (James, Ref.), dated 12/11/03, which, on consent of the parties, awarded them joint custody of their daughter, Jada Alexandra N., born 9/9/01, with residential custody to the father. Each party now seeks sole custody of Jada. Father also seeks an order of [*2]protection keeping mother away from the child, alleging that mother sexually abused the child.
Having heard the evidence offered at the hearing and having reviewed the recommendations of the Law Guardian, and with thorough and careful consideration, the court makes the following findings and conclusions.
The existing custody order is, at best, unusual, and the court questions whether it should have been entered and whether it should now be considered controlling in any meaningful way. The order provides that "physical and residential custody...shall remain with" the father, yet the parties were residing together with the child at the time, as indicated in the order, and continued to reside together for almost two years after its entry. In pertinent part, the order provides as follows:
 
 "The parties shall have joint legal custody of the infant child and physical and residential custody of Jada Alexandra N. shall remain with the petitioner father, while both parties reside at 55 Deer Path Road, N. Great River, New York. If the petitioner father relocates away from the residence prior to the Respondent mother, physical and residential custody shall revert to the respondent mother, while she resides at said address. If the respondent mother relocates away from the residence, physical and residential custody is to remain with the petitioner father."
Notwithstanding the fact that the parties shared a residence and shared actual custody of their child at the time the order was entered, the Referee somehow awarded physical and residential custody to the father and made prospective findings as to who was to have custody of the child in the future should one of the parties leave the residence.
This, in essence, was a predetermination of Jada's best interests at some indeterminate point in the future with no provision for judicial review of the circumstances existing in the child's life at the time either mother or father decided to move out. It is doubtful that such an order should have been entered, the consent of the parties notwithstanding. For these reasons, the court now affords it little significance.
The parties resided with Jada in a small one-bedroom basement apartment in the home of paternal grandfather Robert N.. Residing in the upstairs portion of the home were father's two sisters Brianne and Caitlin and paternal grandmother, who passed away in October 2005.
The home environment became increasingly oppressive to mother as father and his family were openly hostile, critical, and controlling toward her. Paternal [*3]grandfather often left mother notes telling her how to compact the garbage, vacuum the floor, do the laundry, and how to care for Jada. One of grandfather's demeaning notes to mother compared mother's child rearing skills to those of her own mother, from whose custody she had been removed and placed in foster care.

Mother could not leave the home at will with her child, as the child's two car seats were kept locked inside family vehicles to which she had no access, and father did not approve of mother's vehicle. The times at which mother left the residence on her own, even to go to work, were closely monitored by paternal grandfather. While at home, mother frequently found herself locked downstairs while Jada played upstairs with father's family.
Mother often expressed her concerns regarding Jada's well-being to father and to paternal grandfather. Mother was concerned that father was physically rough and often impatient with Jada and would frequently ridicule Jada for her behavior. Mother objected to Jada sleeping in bed with her grandparents (grandfather continued this practice after his wife died, finding Jada to be a "comfort" to him) and that grandfather's English mastiff was allowed to remain in the home after biting Jada in the face, an injury which necessitated sixty stitches.
Neither father nor grandfather took any steps to address these concerns.
Father acknowledges his shortcomings as a parent. He finds Jada to be a "tough kid" and admits his lack of patience with her. Father is frequently scolding the child and puts her in a corner for extended punishments. Grandfather describes father as being "too guy rough" with Jada. On one occasion, Jada had to be referred to an orthopedist for a wrist injury caused by father holding her hand too tightly.
Father freely admits, at the age of 32, to needing the "guidance, counsel and benign management" of grandfather in raising Jada. Just a year ago, father wrote a "personal punch list" in which he indicated that he was "relinquishing [his] role" to grandfather and would "play the role of co-custodian." At the suggestion of grandfather, father discussed with mother his desire to transfer custody of Jada to grandfather, thereby conceding that he was not a proper custodian for this child.
For the most part, father has indeed abdicated his role as a parent to his father and relies excessively on his father for every day decision making regarding Jada, including the choice of pre-school and medical treatment, all to the exclusion of mother. Father has never lived on his own and is financially dependent upon his father.
[*4]
Grandfather, who admits to being "a pompous ass" and micro-managing the child-rearing of his granddaughter (although he sees nothing wrong with that), arranged and financed mediation between mother and father at the end of 2003, with the goal of having custody of Jada awarded to himself. Mother would not consent, and the existing agreement was brokered.
A closer reading of the order reveals that only the parent who remains at grandfather's home would have custody of Jada, making it clear that grandfather was meant to remain in control of this child's life. Mother felt pressured into entering this agreement; she felt that her failure to do so would result in her being evicted from the home, with Jada being left behind. Subsequent events proved her to be prescient.
In July 2005, grandfather drafted and signed a rather remarkable proposal entitled "prime residential custody by paternal grandfather." The document sets forth strict guidelines regarding the manner in which the parents were to comport themselves in relation to Jada's child rearing.
Some of the highlights are a twenty-four hour notice to grandfather requirement if a parent were to take Jada on a trip in excess of four hours and a provision for immediate eviction should a parent not comply with grandfather's rules. All decision making regarding Jada's discipline, diet, schooling, education, religion, financial issues, health and hygiene, and living environment were to be "guided daily" by grandfather and any disagreements were to be "immediately resolved by paternal grandfather "without trepidation, prejudice or question" by the parents.
The situation in grandfather's home continued to deteriorate, with grandfather attempting to exert even more influence, mother being treated increasingly like an outsider, and father siding with his family against mother in all things relating to Jada.
The hostilities increased to the point of two separate physical confrontations one week apart during mid August 2005. In the first incident, mother was pushed by grandmother. Mother took no action until a week later, when she was almost pushed down the stairs by grandfather. Mother then called the police, filed criminal charges against grandfather, and obtained an order of protection.
With hostilities mounting, mother left the home with Jada on 8/31/05. She [*5]contacted father via six cell phone text messages advising him that the child was with her, was safe, and that he would see her soon. Mother also had Jada speak to her father on the telephone. On 9/6/05, father obtained an order to show cause (Freundlich, J.) enforcing the Referee's order of 12/11/03 and temporarily transferring custody of Jada to father. Mother was served with the papers late that evening while Jada was asleep; she gave the child to father the following morning without incident.
In just one of the many inconsistencies presented during his testimony, father claims not to have known where the child was located at the time, but he was parked outside the home at which mother was staying with Jada when mother was served with the order to show cause.
On 8/19/05, before she left the home, mother filed a petition seeking a modification of the custody order. By order dated 8/30/05 (Freundlich, J.), that petition was summarily dismissed upon intake. Mother refiled her custody petition on 9/7/05.
When father brought his order to show cause, he sought an order suspending mother's visitation (the 12/11/03 order had granted mother alternate weekends and two midweek evenings of unsupervised visitation, with the midweek being an overnight period until the child entered school.) This application was not granted. However, having been denied this relief by the court, father nevertheless took it upon himself to suspend mother's visitation, and denied mother access to Jada after she was returned.
Mother did not see Jada for her birthday on September 9th. Mother did not see Jada until 9/27/05 (a full three weeks after she was returned to father), when father graciously "allowed" mother to have visitation supervised by the paternal grandparents. There was no court order restricting mother's contact with the child in this fashion; father admitted that he knowingly and deliberately violated the existing court order. This situation continued until 10/13/05, when the parties appeared before this court and father was admonished to comply with the court order and allow mother to have unsupervised contact with the child.
Father apparently decided that he was not going to "allow" the court to have the final say. Following mother's very first unsupervised contact with Jada, three hours on Tuesday, October 18, 2005, father and his family fabricated allegations that mother had sexually abused the child during this visit.
[*6]
The court reaches the conclusion that these allegations were fabricated based on: (1) the testimony and negative physical findings of Richard Ancona, M.D., upon a complete gynecological examination the following day*; (2) the report and negative findings of the Suffolk County Child Advocacy Center medical staff upon a second complete gynecological examination conducted nine days later (the child had to be brought back a second time because of her reluctance to be examined); (3) the determination of Child Protective Services that the allegations were "unfounded;" (4) the testimony of father, his sister Caitlin, and paternal grandfather regarding the events surrounding the child's purported "disclosure;" testimony that was so internally inconsistent and differed from each other to such an extent as to strain the boundaries of both logic and credibility; and (5) the Law Guardian's findings after his own remarkably thorough and comprehensive investigation.
*While the child was allegedly molested with a flashlight, Dr. Ancona found no marks, no bruises, no tears, and no pain; the hymen was intact, and there was no discharge. The vaginal area was red and swollen, and the child was diagnosed with vaginitis a month after receiving antibiotic therapy. This was the exact same diagnosis Jada was given on 1/27/06, following another course of antibiotics.
With the custody matter pending before this court, father filed a family offense petition before a different judge on 10/21/05 (the very eve of the beginning of mother's overnight visitation), and, based on the allegations of sexual abuse, obtained a temporary order of protection keeping mother away from Jada except for visitation supervised by the Department of Social Services.
This court learned of this development when the parties appeared on 10/26/05, arranged for a transfer of the family offense proceeding to this court, and adjourned that matter for a hearing on 11/3/05. On the adjourned date, father's counsel claimed she was unable to proceed to hearing, and the matter was the subject of a lengthy conference regarding the continuance of the temporary order of protection.
The reports from Child Protective Services (CPS) and the Child Advocacy Center (CAC) were marked into evidence. The Law Guardian gave a comprehensive report based on his interviews with the CPS caseworker,
Dr. Ancona, and many other collateral contacts. The Law Guardian reported that he had no concerns allowing mother to have continued unsupervised visitation with Jada and indicated that he would even want the child to have an extended visit with her mother. The Law Guardian strongly felt that father had coached Jada into making these statements and reported that he had other concerns regarding the child's safety with father.
[*7]
Based on the CPS and CAC reports and the Law Guardian's findings, the temporary order of protection was vacated, allowing the then existing order of visitation to continue. The parties were prohibited from taking the child for any further examinations or evaluations without leave of the court. Father's request for a sexual abuse validation/forensic/psychological evaluation of the child was denied with leave to renew upon the completion of testimony. That application was never renewed.
The court now finds, after hearing, that the sexual abuse allegations, the only allegations contained within the family offense petition, are not supported by any measure of credible evidence, and that petition is dismissed for failure to establish a prima facie case.
Following the first day of testimony on 2/6/06, the court issued an interim order, with the approval of the Law Guardian, expanding mother's midweek visitation to include an overnight period (father had prevented the midweek overnight by placing the child in a full-time preschool program.)
Following the second day of testimony on 3/16/06, the court, again with the approval of the Law Guardian, issued a second interim order further expanding mother's visitation to include overnight visitation periods each weekend (Friday afternoon to Saturday evening alternating with Friday afternoon to Sunday evening) plus the midweek overnight visitation.
Throughout the course of this litigation, father's view of mother's role in Jada's life has been profoundly negative, and his attempts to control mother's relationship with Jada have been extreme. Father's bizarre behavior reflects a calculated effort to remain in control and to minimize the importance of mother's presence in Jada's life. Father did everything conceivable to impede the relationship between Jada and her mother, including the fabrication of sexual abuse allegations, subjecting this four-year-old child to two invasive and traumatic gynecological examinations.
Demonstrating his unwillingness to communicate directly with mother, father would hand mother a letter every time she came to pick up the child. These letters would include instructions on how mother was to care for the child, the ambient temperatures at which she was permitted to take Jada outdoors, and the type of food she was to feed the child. Father carried the medical insurance for Jada and would limit mother's use of the insurance to the exact time frame of her scheduled visitation. These letters were signed by father and reviewed and "witnessed" by paternal grandfather.
[*8]
Father registered Jada for preschool after consultation with grandfather, not mother. Father and grandfather then moved the child from a part-time program to a full-time program in a different school to prevent mother's midweek overnight visitation.
Father does not call mother in advance to cancel visitation; he prefers to have mother arrive at his home only to tell her that the child is not available due to illness. This has occurred on numerous occasions, including Christmas Eve.
Father does not give the child to mother while he is working, as required by the order. Father has refused to disclose his work schedule to mother and to the court, but testimony reveals that he frequently works late evenings and overnight shifts. Father leaves Jada in the care of his family, rather than in the care of her mother, during these times. The order requires shared school recesses. Mother was denied access to the child the entire Christmas recess and only saw Jada for two days during the winter recess.
Father has instructed the child's pediatrician not to provide any information regarding Jada to mother. Father failed to inform mother that Jada was performing in a holiday concert at school until after the fact. Father and grandfather have been bribing the child with promises of a pony and a puppy.

Father decided it was not a good idea to let mother see Jada's school work, so he would not send Jada's school bag with her on Wednesday evenings. Father would bring it to school on Thursday mornings, seemingly finding it necessary to be present when mother returned the child to school after her midweek visitation.
Whenever Jada was even slightly ill, father brought her to the pediatrician and obtained a written note stating that the child had to remain "at home." Father used these notes to deny mother visitation on many occasions (including the length of the Christmas recess) with no thought of either allowing the child to convalesce at her mother's home or providing any makeup visitation.
Father and his family videotaped all of the visitation exchanges, which take place at father's home. The video camera was turned on whenever mother appeared, in full view of the child. Father also monitored all of the child's phone conversations with her mother by use of speaker phone and has recorded each conversation. The child is aware that her conversations with her mother are being monitored and recorded.
The interim order issued on 3/16/06 put an end to these practices. It did [*9]not, however put an end to the hostilities visited upon mother in front of the child during the visitation exchanges. After the fourth day of testimony on 4/14/06, the court found it necessary to issue an order of protection in an attempt to safeguard Jada. Father was directed to ensure that he and all members of his family remain in the family residence during all visitation exchanges. The parties were advised that mother could walk halfway up the driveway to meet the child.
Once again, father decided that he wasn't going to be bound by a mere court order. On the following visitation day, mother walked halfway up the driveway as directed, only to be castigated by father to "get off the property." Father and grandfather's girlfriend then walked the child to the car, with father stating that he wasn't going to allow the child to walk to the car alone.
In yet another glaring reflection of his pronounced lack of credibility, father's explanation regarding this event was twofold. Father claimed that he did not know that he could not walk Jada to the car. He contends that he left court after being served with the order of protection in the presence of his attorney without reading the order. However, father also maintains that there was nothing wrong in having grandfather's girlfriend walk to the car because she was "not covered" by the order (which he didn't read.)
Seemingly no court order would be sufficient to prevent or contain father's controlling, debasing, and derisive behavior towards mother no matter the extent of the emotional impact such behavior might have on young Jada.
The child has apparently already been adversely affected by the existing situation, including the unfettered hostility towards mother which exists in father's household. This hostility was amply demonstrated by father, grandfather, and, particularly, by father's sister Caitlin, who is at home full time and is utilized by father as Jada's primary child care provider.
While Jada still shares a loving relationship with her mother, she has, on occasion, called mother "bitch" and "fuck." The child has become tentative, guarded, apologetic, quick to take blame, unsure about the truth, and seeks constant approval.
Mother now resides in a spacious one bedroom apartment in a private home. She gave the bedroom to Jada so the child could have her own space and sleeps on a convertible sofa in the living room. Father remains in a small one bedroom apartment in the basement of grandfather's home; he and Jada sleep in the same 13' x 13' bedroom.
[*10]
Mother is employed by a manufacturing company where she earns $400 per week. Her work hours are Monday through Thursday, from 8:30 to 5 PM and Fridays from 8 AM to 2 PM. If she is awarded custody, mother has established a support system of family and friends, including those with other children who attend what would be Jada's elementary school. There are also before-school and after-school programs available for the child.
The court did not conduct an in camera interview with four-year-old Jada. The child has already been much too involved in this dispute. She has been videotaped and monitored. The child was interviewed extensively by the Child Advocacy Center, Child Protective Services and her pediatrician when the sexual abuse allegations were being investigated. The Law Guardian, who requested that an in camera not be held, has been in regular contact with the child, conducted his own exhaustive investigation, and provided comprehensive recommendations to the court.
Based on these factors and the child's tender age, the court thought it best not to involve Jada further, as no additional information would have been obtained from such an interview, which would have been overly invasive at this point. Thompson v. Thompson, 267 AD2d 516, 699 NYS2d 181 (3rd Dept., 1999); Walker v. Tallman, 256 AD2d 1021, 683 NYS2d 329; Farnham v. Farnham, 252 AD2d 675, 675 NYS2d 244 (3rd Dept., 1998); Smith v. Finger, 187 AD2d 711, 590 NYS2d 301 (2nd Dept., 1993), lv. app. den., dism., 82 NY2d 704, 601 NYS2d 578 (1993).
At the conclusion of the testimony, the Law Guardian recommended that custody be awarded to mother to safeguard Jada's "mental health and physical safety." He referred to the open hostility towards mother, the interference with visitation, and the efforts to exclude mother from the child's life as "a pattern of abuse that is so insidious that a four-year-old child had to undergo examinations for sexual abuse."
He noted that mother has been denied access to the child. The Law Guardian commented on mother's concern for the child, notwithstanding all that she's endured, as reflected in her desire to have the child remain involved with father and his family. The Law Guardian specifically made no recommendation as to the nature or frequency of any visitation for father, leaving that to the discretion of the court.
As with any determination of custody, the sole concern of the court is which resolution will best serve the interests of the subject child by promoting the [*11]child's welfare, happiness, and optimum development. Eschbach v. Eschbach, 
56 NY2d 167, 451 NYS2d 658 (1982); Friederwitzer v Friederwitzer, 
55 NY2d 89, 447 NYS2d 893 (1982); Nehra v. Ulhar, 43 NY2d 242,
401 NYS2d 168 (1977). Among the factors to be considered in ascertaining the child's best interests are:
(1) the demonstrated parenting ability and relative fitness of the parties;
(2) the love, affection, and nurturing given by each party to the child, the emotional bond between the child and each party, and the willingness and ability of each party to put the child's needs ahead of his/her own;
(3) the length of time the child has lived in a stable and satisfactory environment, the desirability of maintaining the current custodial residence, and the stability of the proposed custodial residence;
(4) the ability of each party to provide for the child's emotional and intellectual development;
(5) the financial resources available to each party and the ability of each party to provide the child with food, clothing, housing, and medical care;

(6) the individual needs and expressed desires of the child and the degree to which the custodial determination would either continue or interrupt the various elements of the child's day-to-day life;
(7) the willingness and ability of each party to facilitate and encourage a close and optimum relationship between the child and the other party; and
(8) any other factor deemed relevant to a particular custody dispute; e.g., domestic violence, substance abuse, fabricated allegations of sexual abuse, and its impact on the child.
"In determining whether a custody agreement should be modified, the paramount issue before the court is whether, under the totality of the circumstances, a modification of custody is in the best interests of the children." Johnson v. Johnson, 309 AD2d 750, 765 NYS2d 271 (2d Dept., 2003).
"Moreover, where parents enter into an agreement concerning custody it will not be set aside unless there is a sufficient change of circumstances since the time of the stipulation and unless the modification of the custody agreement is in [*12]the best interests of the children.'" Smoczkiewicz v. Smoczkiewicz, 2 AD3d 705, 770 NYS2d 101 (2d Dept., 2003), citing Gaudette v. Gaudette, 262 AD2d 804, 691 NYS2d 681 (3d Dept., 1999).
In the case at bar, father is simply less capable of properly caring for Jada. He finds her to be a "tough kid," has little patience with her, is physically rough with her, frequently criticizes her behavior, and subjects the child to extended periods of punishment. Jada is only four years old. One can only imagine how "tough" father will find her to be once she turns fourteen. Father exhibits little emotional bond with the child.
Father acknowledges his shortcomings as a parent and cannot parent this child independently. He admits that he needs grandfather's assistance in raising Jada. Just a year ago, father conceded that he was not a proper custodian for this child when he was prepared to relinquish custody to grandfather. Father has abdicated his role as a parent to his father and relies excessively on his father for every day decision making regarding Jada.
Mother is the more capable parent. She has patience with Jada and employs appropriate and constructive discipline. Mother has a loving and nurturing relationship with the child, and is willing and able to foster a positive relationship between Jada and her father.
In stark contrast, father has amply demonstrated that the only kind of relationship he is capable of fostering between the child and her mother is one which is negative and hurtful to Jada. The relationship father would like to foster between Jada and her mother is one which is non-existent.
Father has done everything in his power to exclude mother from Jada's life, including repeated denials of visitation in violation of court orders. Father prevented mother from having any contact with the child's pediatrician, registered Jada for school without consulting mother and then switched her to a full time program to prevent midweek overnight visitation.
When an order of protection became necessary to shield Jada from father's unbridled hostility and controlling behaviors (and that of his family), father simply chose to ignore it. Finally, in the most dramatic attempt to exclude mother from Jada's life, father fabricated allegations of sexual abuse.
While Jada has resided in a physically stable environment, it is neither a healthy nor an emotionally stable one. The frequent manifestations of hostility [*13]toward mother demonstrated by father and his family are hurting this child.
Remarkably, despite everything to which mother has been subjected, she
shows no signs of animus. She feels that Jada would benefit from ongoing contact with father and his family. This is truly a reflection of mother's ability and willingness to foster a positive relationship between Jada and her father as well as her ability to place her child's needs ahead of her own.
Father's open animosity toward mother, his blatant attempts to exclude mother from Jada's life, including the frustration of visitation and the fabrication of sexual abuse allegations, and his attempts to destroy the relationship Jada enjoys with her mother are harmful to this child and render father the less fit parent. Greene v. Gordon, 7 AD3d 528, 776 NYS2d 73 (d Dept., 2004), Fallon v. Fallon, 4 AD3d 426, 771 NYS2d 381 (2d Dept., 2004), David K. V. Iris K.,
276 AD2d 421, 714 NYS2d 297 (1st Dept., 2000); Miller-Presutti v. Presutti,
257 AD2d 562, 683 NYS2d 289 (2d Dept., 1999); Maloney v. Maloney, 208 AD2d 603, 617 NYS2d 190 (2d Dept., 1994); Matter of Custody of Rebecca B., 204 AD2d 57, 611 NYS2d 831 (1st Dept., 1994).
Were father to be granted custody, he would undoubtedly continue to sabotage, and may even eradicate, the child's relationship with her mother. T0his would be detrimental to Jada's emotional well-being.
In view of the foregoing, the court concludes that it would be in Jada's best interests for custody to be transferred to her mother. 
The court feels that the existing order should not be considered controlling. The parties shared a residence and shared actual custody of their child at the time the order was entered awarding "physical and residential custody" to the father. It is difficult to comprehend exactly what that means under the circumstances existing at that time. The parties continued to reside together for almost two years after the entry of the order. The order also made prospective findings as to which parent was to have custody in the future should one of the parties leave the residence, with no provision for judicial review should that occur.
Assuming, arguendo, that the existing order is deemed to be controlling, there is certainly an adequate basis for its modification at this time. Father's inability to properly parent this child, his interference with mother's relationship with the child, and his open hostility towards mother comprise a sufficient change of circumstances to warrant modification and a finding that a modification of the [*14]order would now be in Jada's best interests.
The court further finds that father's unrestrained hostility towards mother, his seeming inability to control his desire to interfere with the mother-daughter relationship, his fabricated allegations of sexual abuse, his repeated failure to comply with court ordered visitation, his violation of an order of protection, and his total lack of insight into the impact these behaviors have on his child make it necessary to restrict the father's contact with Jada to supervised visitation.
"Supervised visitation is not considered a deprivation of meaningful access to a child." Abranko v. Vargas, 26 AD3d 490, 810 NYS2d 509 (2d Dept., 2006); Graham v. White, 16 AD3d 583, 790 N.Y.S. 876 (2d Dept., 2005). While such visitation is restrictive, under the circumstances herein, it is absolutely necessary to safeguard this child's emotional health and safety.
Such a finding was made under strikingly similar circumstances in Carl J.B. v. Dorothy T., 186 AD2d 736, 589 NYS2d 53 (2d Dept., 1992.) Therein, the father had also been the custodial parent by agreement between the parties.
The Court found that father "consistently attempted to undermine, if not eradicate, the child's relationship with her mother, and to portray the mother as a child abuser." During the pendency of the custody proceeding, the father "demonstrated his unwillingness for the child to have a relationship with her mother. For example, in defiance of the court's admonishment to him, the father
interfered with the mother's visitation."
The court ordered father to have supervised visitation once per week predicated solely upon father's behavior in this regard. The court also issued an order of protection against the father directing him "not to interfere with the mother's custody of the child and to desist from any direct or indirect endeavor to continue undermining the mother-daughter relationship."
In the case at bar, father has, from the very outset of this litigation, knowingly and repeatedly defied court orders and court admonishments and has simply refused to allow visitation between Jada and her mother to go forth unimpeded.
His application to suspend mother's visitation was denied, yet he would not allow mother to see the child for a full three weeks. When visitation took place following the initial court appearance, father insisted that it be supervised by his parents.
[*15]
Upon being admonished to comply with the order and allow unsupervised visitation, father fabricated allegations of sexual abuse. On the eve of what was to be mother's first overnight visitation, father obtained an order of protection from a different judge stopping the visit. When that order was dismissed, father moved the child from a part-time preschool program to a full-time program to stop the midweek overnight visitation.
Father repeatedly utilized doctor's notes to stop visitation when there was nothing preventing the child from convalescing at her mother's home. Father never advised mother that these visits were being cancelled until she arrived to pick up the child. Father utilized this ruse to deny mother access to the child on Christmas Eve and the entire Christmas recess.
Father denied mother access to the child for half of the February recess, as ordered. Father never gave the child to mother while he was working, as ordered. Father interfered with the child's contact with her mother by monitoring all of her phone calls on a speaker phone and recording each conversation. Father videotaped each visitation exchange.
It took a court order to stop some of these practices. Finally, when an order of protection became necessary to safeguard the child during visitation exchanges, father willfully and knowingly disregarded the order of protection.
There is nothing this court could put into place, no order it could fashion, no army it could summon, short of an order of supervised visitation, which would control father's behaviors and safeguard this child.
Father's visitation with Jada shall occur once per week and shall be monitored by the court Supervised Visitation Program, on a schedule to be established by the Program, with periodic reports to the court and the Law Guardian. This visitation schedule shall continue until such time as father can demonstrate, through appropriate therapeutic intervention (should he choose to avail himself of same), that he has understands what it means to co-parent a child in a positive, constructive, and healthy fashion.
Separate orders will enter.
Dated: May 4, 2006
[*16] 
 BARBARA LYNAUGH 
 JUDGE OF THE FAMILY COURT